*This opinion is subject to revision before final publication in the Pacific Reporter*

**2024 UT 26**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH, in the interest of A.H., J.H., J.H., L.H., N.H., S.H., and E.H.,
persons under eighteen years of age.

STATE OF UTAH,
*Petitioner,*

*v.*

S.H. and N.H.,
*Respondents.*

No. 20221029
Heard November 13, 2023
Filed July 25, 2024

On Certiorari to the Utah Court of Appeals

Fourth District Juvenile Court, Utah County
The Honorable Suchada P. Bazzelle
Nos. 1146856, 1145457, 1145458, 1145453, 1145454, 1145455,
and 1145456

Attorneys*:

Sean D. Reyes, Att'y Gen., Carol L.C. Verdoia, John M. Peterson,
Asst. Att'ys Gen., Salt Lake City, for petitioner

Martha Pierce, Salt Lake City, Guardian ad Litem

Alexandra Mareschal, Kristin H. Norman, Jason B. Richards,
Debra M. Nelson, Salt Lake City, for respondent N.H.
Emily Adams, Salt Lake City, for respondent S.H

---

* Additional attorneys: Dick J. Baldwin, Salt Lake City, for amicus curiae National Association of Counsel for Children, in support of neither party.

In re A.H.

Opinion of the Court

CHIEF JUSTICE DURRANT authored the opinion of the Court, in which ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE PETERSEN, JUSTICE HAGEN, and JUSTICE POHLMAN joined.

---

CHIEF JUSTICE DURRANT, opinion of the Court:

## INTRODUCTION

¶1     This case concerns a lengthy interaction between a family and Utah's child welfare system. The saga began in 2018, when a juvenile court, responding to a petition from the Utah Division of Child and Family Services (DCFS), removed seven children from their biological parents' custody on grounds of abuse and neglect. The children were restored to their biological parents' custody in early 2019 but were removed again a few months later after DCFS found continued problems.

¶2     After this second removal, DCFS was unable to find a single temporary placement that could host all seven children. The five oldest children were initially placed with various families before eventually being sent to live with their grandparents in New Mexico. The two youngest, Alice and Liam,[1] were placed with a foster family in Utah. This separation persisted until October 2020, when the juvenile court began proceedings to determine which permanent placement would be best for each child. These proceedings, known as a termination trial, were specifically held to determine whether the court should terminate the legal connection between the children and their biological parents. At these proceedings, the Attorney General's Office represented DCFS, a court-appointed guardian ad litem represented the children, and private counsel represented the biological parents.

¶3     Before the termination trial began, the parties agreed to place the five oldest children in New Mexico with the grandparents as their permanent guardians. But the parties could not agree on where to place Alice and Liam, so the trial focused on those two children. After several days of testimony from the biological parents, grandparents, foster family, and the therapists and caseworkers who had supervised the two children, the juvenile court reached a decision. The court determined that it was in Alice and Liam's best interest to terminate their legal relationship with their biological parents and to allow the foster family to adopt them. The biological parents appealed that decision.

---

[1] These names are pseudonyms.

¶4    The court of appeals reversed the termination order, concluding that the juvenile court's decision was against the clear weight of the evidence. The appellate court also held that, for the termination of parental rights to be necessary, termination must be "materially better" than any other option. Because it reversed on the merits, the court of appeals did not reach some of the other issues the parents raised, including whether their counsel had been ineffective. The State and the guardian ad litem petitioned for review of the court of appeals' ruling, and we granted certiorari. The guardian ad litem also raises the argument that one of the cases the juvenile court relied upon, *In re B.T.B.*,[2] was wrongly decided.

¶5    As a threshold matter, we reject the guardian ad litem's contention that *In re B.T.B.* is flawed. We also find several errors in the court of appeals' reasoning. First, the court erred by applying the "materially better" standard instead of the relevant statutory language. Second, the court exceeded the scope of appropriate appellate review by reweighing evidence and considering evidence outside the record. Third, the court erred by concluding that the juvenile court's termination decision was against the clear weight of the evidence. Accordingly, we reverse and remand for consideration of the remaining issues in the biological parents' initial appeal.

## BACKGROUND[3]

¶6    We begin with the composition of the family at issue: a mother, a father, and seven children. The mother is the biological mother of all seven children. The father is the biological father of all but the oldest child. To avoid confusion, we refer to the mother and father collectively as the biological parents. For the purposes of this case, the children can be divided into two groups. The first group consists of the two youngest children: Alice, who was six years old at the time of the termination trial in October 2020, and Liam, who was four years old. The second group consists of Alice and Liam's five older siblings, who ranged in age from fifteen to

---

[2] 2020 UT 60, 472 P.3d 827.

[3] We recite the facts in the light most favorable to the trial court's decision. *438 Main St. v. Easy Heat, Inc.*, 2004 UT 72, ¶ 72, 99 P.3d 801.

eight years old at the time of the termination trial.[4] Also in the picture are the children's grandparents. The grandparents are biologically related to only the oldest sibling. But the various parties and the court of appeals refer to them as grandparents to all the children, and we follow suit.[5]

¶7 Alice, Liam, and their siblings were first separated from their biological parents in August 2017.[6] Due to the difficulty of finding a single placement that could accommodate seven children, who at the time ranged in age from twelve years to six months, the children were placed with three separate foster families. Alice and Liam were placed together, separate from their siblings.

¶8 Approximately ten months later, in May 2018, DCFS began returning the siblings to their biological parents for a trial home placement. By late June, all the siblings were living with their biological parents, and in early July they were joined by Alice and Liam. The juvenile court restored custody to the biological parents in January 2019 with continued support and supervision by DCFS. That arrangement was short-lived; by May, DCFS petitioned to remove the children again, citing new concerns.

¶9 Once again, DCFS was unable to find a foster family that could care for all seven children. Shortly after their removal, Alice and Liam were placed with the four youngest of the five older siblings. But by August, Alice and Liam were placed with a separate foster family, with whom they stayed until the termination

---

[4] For simplicity, we use "siblings" to refer to this second group. We use "children" to refer to the seven children collectively.

[5] *See In re A.H.*, 2022 UT App 114, ¶ 2 n.2, 518 P.3d 993. This case does not require us to determine whether the grandparents are a kinship placement for the children to whom they are not biologically related.

[6] On appeal, the biological parents do not contest the juvenile court's determination that there were grounds for termination. As a result, we do not dwell on the circumstances that led to the children's removal from the parents' care.

trial. The siblings remained in other placements until October 2020, when they were placed with their grandparents.[7]

¶10   The process by which the siblings were placed with the grandparents warrants further examination. The biological parents first raised the possibility of placing the children with the grandparents in July 2019. Because the grandparents live in New Mexico, placing the children with them required compliance with the Interstate Compact on Placement of Children (ICPC).[8] The ICPC does not control where children are placed; that decision is left to the juvenile courts. In this context, the ICPC is simply a standardized way for juvenile courts to determine whether children from one state can be safely placed with a family in another state.[9]

¶11   The juvenile court orally ordered DCFS to begin the ICPC process in July 2019, when it first learned that the grandparents were willing to take the children. DCFS did not actually comply with that order until three months later, in October 2019.[10] The ICPC process was not completed until October 2020, but the juvenile court stated that this year-long duration was "not unusual."

¶12   By the time the ICPC report was returned, the parties were preparing for the termination trial. DCFS filed a petition seeking the termination of the biological parents' rights to all seven children

---

[7] For several months the youngest sibling was also placed with Alice and Liam, but this arrangement ended several months before the termination trial began. Since that point, Alice and Liam have not been placed with any of their siblings.

[8] *See generally,* UTAH CODE §§ 80-2-901 to 910.

[9] *See id.* § 80-2-905(III)(1) (requiring compliance with the ICPC before children in state custody may be sent to another state).

[10] The parties dispute the reason for the delay. The State points to the lack of any written order and notes that a change in DCFS caseworkers shortly after the July 2019 hearing may have caused some confusion. The biological parents point to testimony from the incoming DCFS caseworker that the ICPC process was intentionally delayed until efforts to reunify the children with their biological parents were terminated. As explained below, *infra* ¶¶ 59–61, we do not need to resolve this dispute.

in November 2019. After several delays and attempts at mediation, the trial was set for October 2020. The ICPC investigation approved the grandparents as a potential placement just before the trial began. With that information in hand, the parties agreed that it would be in the best interest of the siblings to be placed in the permanent guardianship of the grandparents. But the parties were unable to agree on the best placement for Alice and Liam, which meant that the testimony at trial was directed at that issue.[11]

¶13 The final speedbump before the termination trial concerned who would represent the biological parents during that proceeding. Though the record is somewhat muddy on the issue, it appears that the biological parents attempted to change counsel shortly before the termination trial began, and in the ensuing confusion no attorney filed a witness list on the biological parents' behalf. Given the delays that had already plagued the termination trial and the last-minute realization of this issue, the juvenile court refused to postpone the trial further. The biological parents were allowed to testify themselves and to call the grandparents as witnesses, but they were otherwise allowed to call only witnesses who were already on the list the State had submitted.

¶14 With this last obstacle overcome, the termination trial began. The State's primary witnesses were Alice and Liam's therapists and caseworkers. These witnesses uniformly testified that Alice and Liam had become strongly attached to their foster family and that the foster family was a healthy and supportive placement for them. One caseworker noted that just a month after they were initially placed with this foster family, both Alice and Liam had begun referring to their foster parents as "Mom" and "Dad" and were "attached and bonded" to the foster parents' other children. One of the therapists testified that Alice and Liam's connection with their foster family was "the most secure attachment [the therapist had] ever witnessed . . . between a foster parent and a foster child."

¶15 There was also testimony about the comparatively weak connections that Alice and Liam had with their biological siblings. The State's witnesses who spoke about the topic agreed that, while the siblings "seemed to have a genuine affection and love" for Alice

---

[11] The juvenile court accepted the stipulation to place the siblings with the grandparents when it issued its final decision in this case.

and Liam, Alice and Liam were "not particularly attached" to them. One caseworker noted that Alice and Liam didn't ask about their older siblings, and that even during visitation they didn't seem to think of their siblings as members of their family. A therapist testified that, when she had asked them to draw their family, Alice and Liam drew themselves with their foster parents but never included their biological siblings in the picture.

¶16 There was conflicting testimony on the possibility of placing Alice and Liam with their siblings and grandparents in New Mexico. On previous occasions when the children had been brought together, there had been conflict between Alice and Liam and their oldest two siblings. When these oldest siblings and Alice and Liam had shared rooms, the siblings had admonished them for feeling connected to their foster family and had yelled at and hit Alice and Liam for referring to their foster parents as "Mom" and "Dad." One witness also mentioned that, because of the trauma that the oldest siblings had themselves experienced, they might not be able to tolerate having Alice and Liam around. But the testimony was not uniformly pessimistic. Some of the same witnesses also noted that the siblings held genuine affection for Alice and Liam and were eager to be reunited with them. And the State's witnesses agreed that the grandparents provided a safe and supportive environment that the five siblings could thrive in.

¶17 Finally, Alice and Liam's therapists and caseworkers agreed that removing Alice and Liam from their foster family would be traumatic for them and would risk serious harm to their wellbeing. One therapist testified that removing Alice and Liam would cause them to "go backwards [in] their development" and that it "would be devastating, hugely devastating[,] for them to be removed." Another testified that Alice and Liam already had attachment issues caused by their turbulent upbringing and that taking away yet another caregiver could create lifelong trust and abandonment issues.

¶18 The biological parents' cross-examination of these witnesses focused, in part, on the lack of visitation between Alice and Liam and their siblings during the periods in which the two groups had been placed separately. Testimony established that, although the children had been able to interact during visits with their biological parents, there had been relatively little children-only visitation. It appears that DCFS had largely left the arrangement of the children's visits up to the grandparents and

foster parents, and that those two groups had struggled to align their schedules.[12]

¶19 After the State and the guardian ad litem rested, the biological parents called the grandparents to testify about their experiences with the children. The grandparents both stated that they were willing to take all the children and that their relationships with the siblings were strong. But the grandparents also acknowledged that, due to the limited opportunities that they'd had to interact with Alice and Liam, their relationships with those two were weak.

¶20 The juvenile court took the matter under advisement. It issued its thirty-four-page written decision in May 2021. The ruling carefully laid out the court's factual findings and agreed with the parties that allowing the grandparents to become the permanent guardians of the siblings was the best option for those five children.

¶21 But, the juvenile court noted, Alice and Liam "are in a very different position than their older siblings." When they were first removed from their biological parents' care, Alice was two years old, and Liam was only eight months old. This meant that both of them had limited time to get to know and bond with their biological parents and siblings. That initial deprivation, combined with the lack of consistent visitation in the years since, meant that Alice and Liam had "little beyond a biological connection" with their siblings.

¶22 The juvenile court then weighed allowing Alice and Liam to be adopted by their foster family—which would entail the termination of parental rights—against the benefits of placing the two with their other siblings under the permanent guardianship of the grandparents.

¶23 The court began this process by noting that the foster family had been the "most consistent and healthy caregivers" that Alice and Liam had ever known. This care and attention meant that the bond between Alice and Liam and their foster family was unusually strong; Liam believed that his foster parents had already adopted him. The duration of this connection also meant that Alice and Liam had more in common with their foster siblings than with

---

[12] The parties dispute who should bear the blame for this lack of visitation. As discussed below, *infra* ¶¶ 54–58, we do not need to resolve this dispute because it is not relevant to the termination decision.

their biological siblings. In short, the court concluded that as far as Alice and Liam were concerned, "[their foster parents] are their parents, [their foster siblings] are their siblings, and [their foster home] is their home." Breaking that bond by placing Alice and Liam with their grandparents and biological siblings would be "very detrimental to them and [would] put them at unnecessary risk for future emotional and mental health issues."

¶24 The juvenile court next examined the benefits and drawbacks of placing Alice and Liam with the grandparents. It noted that, while the grandparents were "certainly appropriate caregivers," they were nonetheless "biological, legal, and factual strangers" to Alice and Liam. And while there was evidence that the siblings loved Alice and Liam, they were also a "large and unruly group." The two oldest siblings had "behavioral issues that cause[d] them to have violent and angry outbursts" and they had been observed scolding Alice and Liam for feeling attached to their foster parents.

¶25 As a result, the siblings "cannot be depended upon to protect" Alice and Liam or to "otherwise tend to their care and developmental needs." The juvenile court was quick to add that the siblings were "themselves children," and it "would be unfair to all of the children" to expect the siblings to take on that responsibility. But to the court, this demonstrated "why, for [Alice and Liam], the caregiver relationship is the more important bond and should be given higher priority than the sibling relationship."

¶26 Finally, the juvenile court examined the potential costs and benefits of severing the bond between Alice and Liam and their biological parents. The court explained that the primary concern was permanency. Placing Alice and Liam alongside their siblings in a permanent guardianship would allow their biological parents to maintain residual parental rights. This, in the juvenile court's eyes, was a risk. The biological parents had "repeatedly neglected" Alice and Liam and had "been unable or unwilling to correct their parental unfitness or incompetence." Testimony at trial had set out that Alice and Liam had a "pressing need to establish and preserve a safe, stable, and permanent home." Allowing the biological parents to once again thrust their children into a custody battle, the court concluded, "might not be devastating for the older children, but it will certainly be devastating" for Alice and Liam.

¶27 Based on these factors, the juvenile court concluded that it was in Alice and Liam's best interest to be adopted by their foster

family. The "[t]ermination of parental rights, therefore, [was] strictly necessary."

¶28 The biological parents appealed this termination decision. Upon review, the court of appeals determined that the juvenile court's ruling was against the clear weight of the evidence.[13] The State and the guardian ad litem then petitioned for review of that decision, and we granted certiorari. We have jurisdiction under Utah Code subsection 78A-3-102(3)(a).

## STANDARD OF REVIEW

¶29 "On certiorari, we review for correctness the decision of the court of appeals."[14]

## ANALYSIS

¶30 Before delving into the details of the parties' arguments, it is worth pausing to discuss the relevant portions of the legal framework in which parental rights are adjudicated. Much of our law in this area has constitutional roots. The fundamental right of parents to raise their children is recognized by both the United States Constitution and the Utah Constitution.[15] These constitutional rights are well protected, and parents do not lose them "simply because they have not been model parents or have lost temporary custody of their child to the State."[16]

¶31 At issue in this case are not the biological parents' constitutional rights, however, but instead the procedures that the juvenile court used to determine that those parental rights should

---

[13] *In re A.H.*, 2022 UT App 114, ¶ 57.

[14] *Pulham v. Kirsling*, 2019 UT 18, ¶ 18, 443 P.3d 1217 (cleaned up).

[15] *See Troxel v. Granville*, 530 U.S. 57, 65–66 (2000) ("[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *In re J.P.*, 648 P.2d 1364, 1375 (Utah 1982) (concluding "that the right of a parent not to be deprived of parental rights without a showing of unfitness, abandonment, or substantial neglect is so fundamental to our society and so basic to our constitutional order . . . that it ranks among those rights referred to in Article I, [§] 25 of the Utah Constitution").

[16] *Santosky v. Kramer*, 455 U.S. 745, 753 (1982).

be terminated. These procedures are established by statute.[17] Specifically, the statutory scheme requires that, "to terminate parental rights, [a] juvenile court must make two separate findings."[18] First, it must find that there are grounds for termination under Utah Code subsection 80-4-301(1).[19] Examples of grounds for termination include abandonment, abuse or neglect, and voluntary relinquishment of parental rights.[20] Second, once the juvenile court finds that a ground for termination exists, it must find that termination of parental rights is "strictly necessary to promote the child's best interest."[21] All of these findings must be made by clear and convincing evidence.[22]

¶32   As part of the strictly necessary determination, the juvenile court must "explore whether other feasible options exist that could address the specific problems or issues facing the family, short of imposing the ultimate remedy of terminating the parent's rights."[23] "If the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary. And

---

[17] Because of the fundamental rights at issue, these statutory procedures must comply with constitutional notions of due process. *See In re Adoption of B.Y.*, 2015 UT 67, ¶ 16, 356 P.3d 1215 (stating that a challenge to adjudication of parental rights "sounds in procedural due process"). These constitutional protections are likewise not at issue.

[18] *State ex. rel A.C.M.*, 2009 UT 30, ¶ 23, 221 P.3d 185; UTAH CODE § 80-4-104(12)(a) (formerly *id.* § 78A-6-503(12).

[19] The statutes that govern termination proceedings have been recodified since the events of this case. For the ease of readability, where the text of a statute has not changed, we will cite the present version and note the old location.

[20] *See* UTAH CODE § 80-4-301(1) (formerly *id.* § 78A-6-507(1) (2020)).

[21] *Id.* § 80-4-104(12)(b) (formerly *id.* § 78A-6-503(12)(b) (2020)); *In re B.T.B.*, 2020 UT 60, ¶ 60, 472 P.3d 827 (concluding that "termination must be strictly necessary to promote the child's best interest").

[22] UTAH CODE § 80-4-103(2)(a) (formerly *id.* § 78A-6-506(3) (2020)).

[23] *In re B.T.B.*, 2020 UT 60, ¶ 67 (cleaned up).

the court cannot order the parent's rights terminated."[24] The statute also requires courts to consider whether "sufficient efforts were dedicated to reunification" and whether "the efforts to place the child with a relative who . . . is willing to come forward to care for the child[] were given due weight."[25]

¶33 With that foundation laid, we turn to the legal issues of this case. First, we reject the guardian ad litem's claim that this court improperly interpreted the termination statutes in *In re B.T.B.*[26] Second, we explain why the court of appeals erred by requiring that the termination of parental rights be "materially better" than any available alternatives. Third, we identify where the court of appeals erred by exceeding the scope of appropriate appellate review or otherwise misapplying our caselaw. Finally, we conclude that the court of appeals erred by holding that the juvenile court's termination decision was against the clear weight of the evidence.

## I. *IN RE B.T.B.* DID NOT CREATE A NEW SUBSTANTIVE RIGHT

¶34 Our analysis begins with the constitutional due process rights of parents. The United States Supreme Court established in *Santosky v. Kramer* that parents have a fundamental liberty interest in the "care, custody, and management of their child."[27] But that liberty interest is not absolute, and it may be terminated under certain circumstances.[28]

¶35 To protect that liberty interest, the Court has imposed a presumption of parental fitness.[29] That presumption of fitness may

---

[24] *Id.* ¶ 66.

[25] UTAH CODE § 80-4-104(12)(b) (formerly *id.* § 78A-6-503(12)(b) (2020)).

[26] 2020 UT 60.

[27] 455 U.S. 745, 753 (1982).

[28] *See id.* at 753–54 (explaining that a parent's fundamental rights may be terminated with the proper procedure); *In re J.P.*, 648 P.2d 1364, 1377 (Utah 1982) ("[P]arental rights, though inherent and retained, are not absolute . . . .").

[29] *Santosky*, 455 U.S. at 753, 769 (establishing a parent's fundamental rights and the minimum standard of proof required to terminate those rights).

be rebutted only by "clear and convincing evidence" of unfitness.[30] Once that presumption has been rebutted, the balance of a parent's rights and the child's welfare shifts.[31] In other words, after the presumption of fitness is rebutted, a parent no longer enjoys that constitutional presumption in the termination proceedings, and, in Utah, the court then turns its focus to whether the termination of parental rights is "strictly necessary" to serve the best interest of the child.[32]

¶36 The guardian ad litem argues that one of our previous cases, *In re B.T.B.*, allowed the biological parents to maintain the presumption of fitness during this second phase of termination proceedings. This, in the guardian ad litem's eyes, is illogical because it allows parents to enjoy the benefit of a constitutional presumption that has already been rebutted.

¶37 But this argument forgets that the aforementioned constitutional presumptions are not the only forces at play in termination proceedings. Utah Code section 80-4-104 establishes that "[i]t is in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents" and that a "child's need for a normal family life in a permanent home, and for positive, nurturing family relationships is usually best met by the child's natural parents."[33] This language is directed at the best interest analysis itself, not at the preceding determination of parental fitness.[34]

¶38 The guardian ad litem's position ignores that distinction. We clarified in *In re B.T.B.* that this statutory preference was not equivalent to a constitutional presumption despite the similar language.[35] Indeed, we explicitly "reject[ed] the proposition that the juvenile court is to, at the best interest stage, weigh a parent's

---

[30] *Id.*; *In re J.P.*, 648 P.2d at 1377.

[31] *See In re J.P.*, 648 P.2d at 1377.

[32] *See In re B.T.B.*, 2020 UT 60, ¶¶ 20–23, 472 P.3d 827 (citing UTAH CODE § 78A-6-507(a) (recodified to *id.* § 80-4-104(12))).

[33] UTAH CODE § 80-4-104(8) (formerly *id.* § 78A-6-503(8) (2020)).

[34] *See In re B.T.B.*, 2020 UT 60, ¶¶ 64–66.

[35] *Id.* ¶ 64.

constitutional rights against the child's welfare and best interest."[36] Because *In re B.T.B.* accurately described the legal framework in which termination decisions should be made, we decline to overrule it.

## II. THE COURT OF APPEALS ERRED BY REQUIRING THAT TERMINATION OF PARENTAL RIGHTS BE MATERIALLY BETTER THAN ANY ALTERNATIVES

¶39 In 2013, the Utah legislature amended Utah Code subsection 80-4-104(12)[37] to permit the termination of parental rights only when doing so, "from the child's point of view, is strictly necessary."[38] In *In re B.T.B.*, we interpreted this language as allowing a juvenile court to terminate parental rights only when it concludes that termination "is in the child's best interest and that termination is strictly necessary to facilitate that option. If the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary."[39]

¶40 The court of appeals erred by modifying that standard in holding that, "where an acceptable kinship placement exists," a juvenile court must show that termination and adoption "is *materially better* for the child[] than the kinship placement is."[40]

¶41 The court of appeals held that this conclusion was dictated by the "clear and convincing evidentiary standard" that governs the termination decision.[41] "After all," it reasoned, if both termination and a guardianship with the available kinship placement "can each equally protect and benefit the child's best interest, then by definition there does not exist clear and convincing evidence in favor of terminating a parent's rights."[42]

---

[36] *Id.*

[37] (formerly *id.* § 78A-6-503(12) (2020)).

[38] UTAH CODE § 80-4-104(12)(b) (formerly *id.* § 78A-6-503(12)(b) (2020)).

[39] 2020 UT 60, ¶ 66, 472 P.3d 827.

[40] *In re A.H.*, 2022 UT App 114, ¶ 49, 518 P.3d 993 (emphasis added).

[41] *Id.* (cleaned up).

[42] *Id.* (cleaned up).

¶42 While this conclusion is understandable, it simply isn't necessary to apply gloss to the termination statute. The language of the statute speaks for itself. And where that is the case, there is no need for us to add our own voice to the mix.[43]

### III. THE COURT OF APPEALS' REVIEW WAS FLAWED

¶43 Three years ago, in *In re E.R.*, this court examined the appropriate degree of deference that appellate courts should grant a juvenile court's decision to terminate parental rights.[44] We recognized then, and affirm now, that these decisions are "properly subject to deferential review."[45] As with other factual determinations,[46] appellate courts may overturn a termination decision only when it is "against the clear weight of the evidence or leaves the appellate court with a firm and definite conviction that a mistake has been made."[47] This deferential standard is appropriate, among other reasons, because the best interest determination "is a factually intense inquiry dependent on the unique circumstances and needs of each child"[48] in which the juvenile court "has a comparative advantage in its firsthand access to factual evidence."[49]

¶44 *In re E.R.* also addressed the extent to which appellate courts may reweigh the legal significance of evidence considered by the juvenile court. We clarified that "[t]here is no universal bar

---

[43] *See Utah Dep't of Transp. v. Target Corp.*, 2020 UT 10, ¶ 29, 459 P.3d 1017 ("These case-law glosses on the statutory text are troubling—not only because they change the subject from the governing terms of the law, but also because they do so using terms that rob our law of its essential determinacy, and thus its susceptibility to predictable application.").

[44] 2021 UT 36, ¶¶ 21–25, 496 P.3d 58.

[45] *Id.* ¶ 25.

[46] *See id.* ¶ 30 ("[W]e hereby clarify that the deference afforded to the juvenile court is the same level of deference given to all lower court findings of fact and 'fact-like' determinations of mixed questions.").

[47] *Id.* ¶ 7 (cleaned up).

[48] *Id.* ¶ 22 (cleaned up).

[49] *Id.* ¶ 15 (cleaned up).

on an appellate court 'reweighing' evidence considered by the juvenile courts."[50] After all, the command that appellate courts determine if the lower court's decision is "against the clear weight of the evidence"[51] indicates that some weighing is required. But we were nonetheless careful to maintain appropriate limits. An appellate court reviewing a termination decision "should not perform its own independent 'reweighing' of the evidence to decide how it would have resolved the matter in the first instance."[52]

¶45 There is one facet of this standard of review that deserves further clarification. In *In re G.D.*, we noted how important it was that juvenile courts making a termination decision "thoroughly and transparently examine all of the relevant facts in determining whether [the clear and convincing] standard has been met."[53] As a consequence, part of appellate review involves considering "whether any relevant facts have been left out."[54] At the same time, it is well established that an appellate court "will not consider evidence which is not part of the record."[55] Putting these principles together, we can see that appellate courts may only consider evidence that a juvenile court ignored when that evidence is part of

---

[50] *Id.* ¶ 31.

[51] *See id.* ¶ 7 (cleaned up).

[52] *Id.* ¶ 32.

[53] 2021 UT 19, ¶ 73, 491 P.3d 867.

[54] *Id.*

[55] *State v. Pliego*, 1999 UT 8, ¶ 7, 974 P.2d 279; *see also Wilderness Bldg. Sys., Inc. v. Chapman*, 699 P.2d 766, 768 (Utah 1985) ("[O]ur review is of course limited to the evidence contained in the record on appeal."). There are limited exceptions. *See, e.g., Mel Trimble Real Est. v. Monte Vista Ranch, Inc.*, 758 P.2d 451, 455–56 (Utah Ct. App. 1988) (discussing when an appellate court may take judicial notice of an adjudicative fact raised for the first time on appeal).

This limit on the consideration of adjudicative facts generally does not apply to an appellate court's consideration of legislative facts, such as the meaning of constitutional language or the definition of a word in a statute. *See generally State v. Rasabout*, 2015 UT 72, ¶¶ 103–05, 356 P.3d 1258 (Lee, J., concurring); *see also* UTAH R. EVID. 201(a) (differentiating between adjudicative and legislative facts).

the record on appeal. And as a corollary, appellate courts are not permitted to weigh evidence from outside of the record against evidence that a juvenile court considered.

¶46 With those principles in mind, we turn to consider whether the court of appeals' review in this case afforded the juvenile court's termination decision the appropriate deference. We find three areas where it did not, and one additional area where the court of appeals' review went astray for other reasons.

*A. Incorrect Reweighing of the Evidence Regarding the Trauma Caused by Separation*

¶47 A central topic in the termination trial was the strength of the bond between Alice and Liam and their foster family, and how severing that bond would affect them. The juvenile court heard testimony from Alice and Liam's caseworkers and therapists and found that the two children had developed an unusually close relationship with their foster family. Indeed, as the juvenile court noted in its judgment, Liam "even believes that he has already been adopted by" his foster family. Based on this testimony, the juvenile court concluded that disrupting that relationship "would be very detrimental to [Alice and Liam] and [would] put them at unnecessary risk for future emotional and mental health issues."

¶48 The court of appeals acknowledged this risk but determined that it was outweighed by the risk of long-term trauma that would result from severing the familial bond between Alice and Liam and their siblings.[56] On its face, acknowledging this risk does not seem unreasonable. The National Association of Counsel for Children, as *amicus curiae*, suggests that the court of appeals' concerns are valid.[57] There are, the *amicus* asserts, several studies showing that children who are legally severed from their biological families may suffer from "ambiguous loss," which can have negative effects over the course of the children's lives.

---

[56] *In re A.H.*, 2022 UT App 114, ¶ 56, 518 P.3d 993 ("[I]n this case, focusing too much on [the juvenile court's concern] risks minimizing the longer-term emotional trauma that permanent severance of the sibling bonds will likely someday trigger.").

[57] This *amicus* brief was filed only in our court. No *amicus* appeared or filed a brief in either the juvenile court or the court of appeals.

¶49 The problem is that the record contains no evidence supporting the idea that termination would risk causing Alice or Liam long-term trauma, either from ambiguous loss or otherwise. None of Alice and Liam's therapists or caseworkers mentioned it as a possibility, nor did their testimony suggest that it was so great a risk as to outweigh the damage that would be caused by severing the existing bond that Alice and Liam had with their foster family.

¶50 The role of an appellate court is to review the record as it exists. Here, the court of appeals relied upon generalized observations from caselaw and academia about the importance of sibling relationships and then determined that those observations outweighed the specific evidence about Alice and Liam that was in the record.[58] That approach exceeded the limits of appropriate appellate review.

*B. Incorrect Reweighing of the Evidence Regarding DCFS's Role in the Deterioration of Sibling Bonds*

¶51 Another point of focus in the court of appeals' opinion was the deteriorated bonds between Alice and Liam and their siblings, and the role that DCFS and the juvenile court played in that deterioration. The relevant facts are not in dispute.

¶52 After the children were removed from their biological parents' custody in the spring of 2019, DCFS was unable to find a single placement that could accept all of them. After a few short-term placements, this resulted in Alice and Liam being separated from their siblings. Just a few months into this separation, the juvenile court discovered that the grandparents were willing to take all seven children. The court ordered DCFS to begin investigating whether the grandparents were a suitable placement. Because the grandparents lived in New Mexico, that meant complying with the procedures of the ICPC. Seemingly due to a changeover in caseworkers, DCFS didn't begin the ICPC investigation for nearly three months. Not including the delay, this investigation ultimately took a year to complete, which the juvenile court stated was not unusual.

¶53 In the fifteen months that elapsed between the juvenile court's order to begin the ICPC investigation and the beginning of the termination trial, there was little visitation between Alice and Liam and their siblings. All parties acknowledge that this period of

---

[58] *See In re A.H.*, 2022 UT App 114, ¶¶ 42, 56.

separation caused the bonds between Alice and Liam and the siblings to deteriorate. The juvenile court, relying on testimony from the children's caseworkers and therapists, concluded that, by the time of the termination trial, Alice and Liam had "little beyond a biological connection" with their siblings.

¶54 The parties dispute who is to blame for this separation and its negative effects, as well as what role that blame should play in the termination decision. The answer to the second question makes answering the first unnecessary.

¶55 The decision to terminate parental rights is rooted in an analysis of the best interest of the child.[59] This analysis "is a wide-ranging inquiry that asks a court to weigh the entirety of the circumstances."[60] It is also an inquiry that is "to be conducted in present-tense fashion, with the effective date of the inquiry being the date of the hearing, trial, or other judicial determination."[61] Put simply, the court must examine the children as they are.

¶56 This is not to say that courts cannot assess the likely future—indeed, they must.[62] Children grow, and the termination decision should anticipate that growth.[63] But this present-tense format does limit a court's ability to assess the past. Outside of the factors enumerated by the relevant statutes,[64] the best interest

_____

[59] *See* UTAH CODE § 80-4-104(12)(a) (formerly *id.* § 78A-6-503(12) (2020)); *In re J.P.*, 648 P.2d 1364, 1368 (Utah 1982) ("The best interest of the child has always been a paramount or 'polar star' principle in cases involving termination of parental rights . . . .").

[60] *In re J.M.*, 2020 UT App 52, ¶ 35, 463 P.3d 66.

[61] *In re Z.C.W.*, 2021 UT App 98, ¶ 12, 500 P.3d 94.

[62] *In re C.L.*, 2007 UT 51, ¶ 22, 166 P.3d 608 ("[A] juvenile court judge conducting a best interests analysis must weigh evidence forecasting future events in order to predict what course of action will best protect and nurture the child.").

[63] *See In re G.D.*, 2021 UT 19, ¶ 79 ("Ultimately, the court declined to place the children with Grandmother because of her own admission that she cannot see herself caring for the children until each of them reaches adulthood." (cleaned up)).

[64] *See* UTAH CODE § 80-4-104(12)(b) (formerly *id.* § 78A-6-503(12) (2020)) (requiring consideration of whether "sufficient efforts were

(continued . . .)

analysis must focus on the children and their current circumstances. Whether either would have been different in some other hypothetical situation should not drive that analysis, nor should who is to blame for the present situation.

¶57 Allowing the best interest inquiry to become contaminated by extraneous discussions of blame and responsibility misses the point. Moreover, it risks letting a child's future be compromised by a desire to punish the adult actors involved. It is undisputed that regular visitation did not occur, and that the bonds between Alice and Liam and their siblings suffered as a result. That is lamentable. But the juvenile court's job in such a situation is not to determine which set of adults deserve punishment. Its job is to ask: "what outcome is in the child's best interest *now*?"[65]

¶58 The court of appeals erred by factoring its view that DCFS and the juvenile court were responsible for the deteriorated bonds into its review of the termination decision. In its opinion, the court of appeals suggested that the lack of relationship between Alice and Liam and their siblings was "largely the result of decisions made by DCFS and the [juvenile] court during the pendency of these proceedings."[66] These decisions included the initial "court-ordered removal from the home at an early age,"[67] as well as DCFS and the foster family's "actions in failing to facilitate regular sibling visitation."[68]

¶59 The court of appeals additionally blamed DCFS not only for the three-month delay in starting the ICPC process, but also for the fact that the ICPC investigation took twelve months to complete once started.[69] The logic was that, because DCFS was tardy in beginning the ICPC process in 2019, the investigation into the

---

dedicated to reunification," as well as whether "efforts to place the child with a relative" were "given due weight"); *id.* § 80-4-301(3)(a) (formerly *id.* § 78A-6-507(3) (2020)) (requiring consideration of whether required family reunification efforts were reasonable).

[65] *In re Z.C.W.*, 2021 UT App 98, ¶ 12.

[66] *In re A.H.*, 2022 UT App 114, ¶ 41.

[67] *Id.* ¶ 40.

[68] *Id.* ¶ 44.

[69] *Id.* ¶¶ 45–46.

grandparents was further delayed by the onset of the COVID-19 pandemic in 2020.

¶60 This conclusion again discounts the factual findings of the juvenile court. That court noted in its termination decision that it was not unusual for an ICPC investigation to take twelve months. It also added that its decision to terminate parental rights would not have been different even if DCFS had acted without delay.[70]

¶61 The court of appeals ultimately concluded that the juvenile court's termination decision was "against the clear weight of the evidence presented at trial."[71] Part of that conclusion rested on its earlier decision that the juvenile court had placed "too much weight [on] circumstances that are of the court's own making."[72] Given the context in which that statement was made, we disagree. The determination of a child's best interest is made in the present tense and should not be unduly swayed by considerations of whether past decisions should have been made differently. The court of appeals erred by allowing its review to be influenced by its belief that DCFS and the juvenile court were to blame for the deteriorated sibling bonds.

---

[70] The court of appeals addressed this portion of the termination decision in a footnote. *Id.* ¶ 46 n.12. Its reasoning was that the juvenile court's conclusion "does not account for" certain procedural events and that "things almost certainly would have been different" had "the ICPC report come back significantly earlier." *Id.* Keeping in mind that termination decisions are reviewed deferentially, we believe that the juvenile court is the best authority on what decisions the juvenile court would have made.

[71] *Id.* ¶ 57.

[72] *Id.* ¶ 41. To support this contention, the court of appeals cited a Pennsylvania case that likewise held a trial court responsible for the effect that its placement decisions had on the termination decision. *Id.* ¶ 40 (citing *In re N.M.*, 186 A.3d 998, 1014 n.30 (Pa. Super. Ct. 2018)). But the appellate court in that case attributed blame to the trial court because it found that the judge had "done everything in her power to alienate the[] parents from their child," committed "egregious failure[s]," and rendered a decision that was "at best, neglectful." *In re N.M.*, 186 A.3d at 1014 n.30. The differences between that case and the present one lead us to conclude that this citation is inapplicable.

*C. Incorrect Reweighing of the Evidence Regarding the Benefits of Reuniting Alice and Liam and Siblings*

¶62   The court of appeals also took issue with one other aspect of the juvenile court's judgment as it pertained to the relationship between Alice and Liam and their siblings. As discussed above, the juvenile court noted that separation caused these bonds to deteriorate to the point that they were little more than biological. The juvenile court also found that the separation had created differences between the two groups that could be problematic if they were reunited.

¶63   These conclusions were drawn from the trial testimony of the caseworkers who had observed the family. For example, the juvenile court noted that the two oldest siblings both had behavioral issues that made them prone to violent and angry outbursts. Caseworkers observed these siblings chastising Alice and Liam for their attachments to the foster family. Based on that testimony, the court concluded that the older siblings could not (and should not) be counted on to protect Alice and Liam from harm. These findings led the juvenile court to conclude that reuniting Alice and Liam with their siblings posed significant risks.

¶64   The juvenile court's conclusions seem reasonable given the factors that would be at play during such a reunion. We cannot say whether these fears would be borne out if the children were reunited. But the juvenile court expressed that it had these concerns, and they appear to have solid foundations in the testimony that came out during the termination trial. The appellate court dismissed many of the lower court's concerns, stating that nothing in the record suggested that reuniting Alice and Liam with their siblings would be problematic.[73] The record, the court of appeals believed, showed at most that the siblings were an "unruly group" but that the same could be said of any large group of children.[74]

¶65   When an appellate court reviews a termination decision, it must show deference to the juvenile court's conclusions.[75] It may overturn those conclusions only if it determines that they are

---

[73] *See In re A.H.*, 2022 UT App 114, ¶ 43.

[74] *Id.* (cleaned up).

[75] *In re E.R.*, 2021 UT 36, ¶ 25.

against the clear weight of the evidence.[76] In that light, the court of appeals should not have rejected the lower court's concerns unless it saw significant flaws in that court's reasoning or could point to specific facts in the record that the juvenile court had misunderstood or failed to consider, and that tipped the scales in the other direction. Dismissing the lower court's well-reasoned concerns with a generalized observation about the unruly nature of siblings is insufficient to meet either standard.

### D. Incorrect Treatment of the Categorical Differences Between Adoption and Permanent Guardianship

¶66 The final relevant difference between the conclusions of the court of appeals and those of the juvenile court is the extent to which the two courts thought it appropriate to consider the categorical differences between the two placements that could result from this termination trial: adoption and permanent guardianship. If the juvenile court were to terminate the biological parents' rights regarding Alice and Liam, then they would be adopted by the foster family. Termination and adoption permanently sever the legal relationship between parent and child.[77] The alternative outcome in this case would have been to place Alice and Liam alongside their siblings and to appoint the grandparents as their permanent guardians. In that case, the biological parents would still maintain a legal connection to Alice and Liam and would have the right to visitation.[78]

¶67 The juvenile court's termination decision weighed the merits of each option as they applied to Alice and Liam. Specifically, the court noted that the biological parents had demonstrated both an inability to care for Alice and Liam and an inability to make meaningful progress toward becoming adequate caregivers. Given those facts, the juvenile court believed allowing the biological parents to attempt to regain custody in the future would be harmful to Alice and Liam's development. Permanently severing the legal relationship between the biological parents and Alice and Liam would prevent the possibility of a chaotic reentry, and that weighed in favor of termination.

---

[76] *Id.* ¶ 11.

[77] *See In re Adoption of K.T.B.*, 2020 UT 51, ¶ 20, 472 P.3d 843; *see also* UTAH CODE § 78A-6-357(3)(c).

[78] *See* UTAH CODE § 80-1-102(70)(a).

¶68 The court of appeals reasoned that this was error, asserting that the juvenile court had relied too much on the categorical differences between adoption and permanent guardianship.[79] We addressed the proper consideration that should be given to these categorical concerns in *In re J.A.L.*[80] In that case, we reversed a termination decision that turned on whether termination and adoption or permanent guardianship were categorically better at providing for a child's need for permanency.[81] We held that allowing these "categorical concern[s]" to control the termination decision violated the basic principle that the best interest inquiry be focused on the individual needs of the child at issue.[82] Judges must instead engage in a particularized analysis that looks to the specific needs of each child as well as the advantages and disadvantages of each potential placement.[83]

¶69 *In re J.A.L.* did not prohibit courts from taking the differences between permanent guardianship and adoption into account when making the termination decision. These categorical differences cannot be dispositive in and of themselves, but they can be one of the many factors evaluated in the particularized best interest analysis.[84] To the extent that the court of appeals faulted the juvenile court for considering these categorical differences, it misinterpreted our caselaw.

¶70 More importantly, however, the juvenile court's ruling suggests that it properly engaged with the particularized reasons why termination and adoption was a better option in this case than permanent guardianship. The court discussed the differences between Alice and Liam and their siblings and how those two's heightened need for a consistent caregiver relationship made

---

[79] *In re A.H.*, 2022 UT App 114, ¶ 54.

[80] 2022 UT 12, 506 P.3d 606.

[81] *See id.* ¶ 25.

[82] *Id.* ¶ 24.

[83] *Id.* ¶¶ 24–25.

[84] *See id.* ¶ 25 ("By statute, the juvenile court must assess whether a permanent guardianship can equally protect and benefit the children in the case before it . . . . [This] requires analysis of the particularized circumstances of the case before the court." (cleaned up)).

adoption the more favorable option. It also gave child-specific reasons why allowing the biological parents to have the residual rights that come along with a permanent guardianship could be detrimental in the future. And most importantly, the juvenile court considered these categorical differences as one part of a larger evidentiary picture and decided to terminate parental rights based on the picture as a whole. We disagree with the court of appeals that this nuanced consideration was flawed.

## IV. THE COURT OF APPEALS ERRED BY REVERSING THE TERMINATION DECISION ON THE MERITS

¶71 The statutes and caselaw governing the decision to terminate parental rights require juvenile courts to articulate child-specific reasons why termination is strictly necessary to serve the best interests of the children concerned.[85] Here, the juvenile court did just that. Its termination order discussed the foster family's ability to provide care for Alice and Liam and the importance of maintaining a consistent caregiver relationship during their development. It highlighted the uniquely strong relationship between Alice and Liam and their foster family and the comparatively weak bonds between Alice and Liam and the grandparents and siblings. It weighed the risk that separating Alice and Liam from their foster family would cause significant trauma, as well as the possibility that this trauma would be compounded by the shock of a turbulent reunification with the siblings. And finally, it showed that the categorical differences between adoption and permanent guardianship, when applied to the specific children at issue, further supported the argument that termination and adoption was the better option.

¶72 These factual findings buttress the juvenile court's conclusion that termination was strictly necessary to serve Alice and Liam's best interest. Given that support, the court of appeals erred by holding that the termination decision was against the clear weight of the evidence.

## CONCLUSION

¶73 The juvenile court appropriately concluded that severing the legal connection with Alice and Liam's biological parents was strictly necessary to serve their best interest. The court of appeals'

---

[85] *See In re B.T.B.*, 2020 UT 60, ¶ 66, 472 P.3d 827; UTAH CODE § 80-4-104(12) (formerly *id.* § 78A-6-503(12)).

reversal of that decision exceeded the scope of appropriate appellate review and misapplied this court's precedent in several ways. Accordingly, we reverse. We remand this case to the court of appeals for consideration of the remaining issues the biological parents raised on appeal.

———————