2025 UT App 20

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF I.C.,
A PERSON UNDER EIGHTEEN YEARS OF AGE.

A.M.C. AND M.C.,
Appellants,
*v.*
STATE OF UTAH,
Appellee.

Opinion
Nos. 20231136-CA and 20231141-CA
Filed February 21, 2025

Third District Juvenile Court, Salt Lake Department
The Honorable Susan Eisenman
No. 1206254

Emily Adams, Attorney for Appellant A.M.C.

Alexandra Mareschal, Attorney for Appellant M.C.

Derek E. Brown, Deborah A. Wood, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Heath Haacke, and Alisha Giles,
Guardians ad Litem

JUDGE AMY J. OLIVER authored this Opinion, in which
JUDGES GREGORY K. ORME and RYAN D. TENNEY concurred.

OLIVER, Judge:

¶1　After an anonymous tip to the U.S. Department of
Homeland Security (DHS) led to the discovery that I.C. (Ana),[1] a
child born in Mexico, was being raised in Utah by a couple
who were not her biological or adoptive parents, the

---

1. We employ a pseudonym for the child.

Utah Division of Child and Family Services (DCFS) obtained a warrant to remove Ana from their home and place her into DCFS custody. M.C. (Michael),[2] the Utah man who was listed on Ana's Mexican birth certificate and had been raising Ana as his own child, sought to establish parentage of Ana. Ana's biological mother, A.M.C. (Mother), a citizen and resident of Mexico, intervened in the juvenile court proceeding, seeking to prevent the termination of her parental rights. After an evidentiary hearing on the petition for parentage and a bench trial on the termination of parental rights, the juvenile court denied the petition for parentage and terminated Mother's parental rights.

¶2 Michael and Mother each raise several issues in separate appeals that we consider together in this opinion. Michael challenges the juvenile court's interpretation of the Utah Uniform Child Custody Jurisdiction and Enforcement Act (the UCCJEA) and, in the alternative, challenges the juvenile court's decisions not to recognize the Mexican birth certificate as a voluntary declaration of paternity under the Utah Uniform Parentage Act (the UUPA) and not to disregard the results of the genetic testing that show Michael is not Ana's biological father. Mother argues the juvenile court erroneously terminated her parental rights by applying the Uniform Unregulated Child Custody Transfer Act (the UUCCTA) retroactively, using the wrong legal standard in determining that Mother abandoned Ana, and in finding that Mother abandoned Ana, as the determination was not supported by clear and convincing evidence. For the reasons set forth below, we affirm.

---

2. A pseudonym.

BACKGROUND[3]

*Ana's Birth in Mexico*

¶3    In 2018, Mother, a Mexican citizen and mother of four, became pregnant with Ana. Mother gave birth to Ana on April 12, 2019, in Mexico. Michael, a U.S. citizen and resident of Utah, who is married to another woman (Wife), was present during Ana's birth. After Ana was born, Mother and Michael obtained a Mexican birth certificate for Ana that listed Mother as the mother and Micheal as the father. To obtain a Mexican birth certificate, the child's mother and the person seeking to be listed as the father take the certificate of delivery[4] issued by the doctor to the civil registry and meet with a magistrate. The magistrate ensures that the individuals present are willing to care for and raise the child. If they are willing to do so, they are listed as the parents on the Mexican birth certificate unless someone challenges the parentage of the child.

¶4    Mother and Michael then went to the U.S. Embassy in Mexico City to get Ana a U.S. passport. At the embassy, officials spoke to Michael and Mother separately and determined that genetic testing would be required to confirm that they were Ana's biological parents. Mother and Michael declined to do the genetic testing, and the embassy declined to issue Ana a U.S. passport.

¶5    Because Ana lacked documentation to enter the U.S., Michael returned to Utah and researched ways to bring Ana to the

---

3. "On appeal from a bench trial, we view the evidence in the light most favorable to the [juvenile] court's findings." *State v. Jok*, 2021 UT 35, ¶ 3 n.3, 493 P.3d 665.

4. A Mexican certificate of delivery includes the mother's name and the baby's name, size, and sex, along with a footprint of the baby and a thumbprint of the mother.

U.S., while Ana remained in Mexico. Michael learned that after a home birth in Utah, parents can fill out an affidavit stating the baby was born at home and receive a Utah birth certificate for the child. On May 5, 2019, Michael filed a "report of birth" claiming that he and Wife were the biological parents of Ana and that she was born at home on April 12, 2019. However, on April 12, 2019, Michael was in Mexico for the birth of Ana and Wife was on a flight from Las Vegas, Nevada to Mexico City, Mexico. Michael received a Utah birth certificate for Ana that listed him as Ana's father and Wife as Ana's mother. Wife then returned to Mexico with Michael's mother and a friend to bring Ana to the United States. Michael's mother and the friend brought Ana across the border in a car using the Utah birth certificate, while Wife simultaneously crossed the border on foot. After Ana made it to the U.S., Michael and Wife raised Ana as their own child. Ana has not seen Mother in person since she entered the U.S.

*DCFS Removes Ana from Michael and Wife's Custody*

¶6     Two and a half years after Ana entered the U.S., DHS received an anonymous tip that an infant was smuggled across the U.S.–Mexico border and a couple was raising her as their own child in Salt Lake City. After investigation, DHS believed that the child mentioned in the tip was Ana. DHS notified DCFS that Ana was a Mexican national living with Michael and Wife, who were not her biological or adoptive parents. DCFS opened an investigation due to human trafficking concerns. During the investigation, additional concerns arose, specifically failure to protect, child endangerment, and sibling child at risk. After the investigation, DCFS made a supported finding of child endangerment against Michael and Wife for the use of forged documents to bring Ana to Utah, a supported finding of failure to protect against Wife, a supported finding for an unregulated custody transfer against Mother, and a supported finding for sibling child at risk for Michael due to past supported findings of

a sexual nature against Michael for conduct involving two of his nieces who were under the age of eighteen.

¶7     DCFS obtained a warrant to remove Ana from the custody of Michael and Wife due to DCFS's current findings against Michael and Wife, its previous finding against Michael for sexual conduct against his nieces, and DHS's concerns. DCFS also filed a petition for custody of Ana.

*The Juvenile Court Proceedings*

¶8     The juvenile court sought to determine whether it had personal jurisdiction over Michael and Wife and whether Michael and Wife could establish standing. The juvenile court ordered both Michael and Wife to undergo genetic testing, which determined that they were not the biological parents of Ana. Michael and Wife did not contest the results, but they nonetheless argued that they had standing to contest the DCFS petition because of the Mexican birth certificate. After receiving briefing and oral argument on the issue, the juvenile court ruled Michael and Wife failed to meet their burden to establish standing because they are not the biological parents of Ana, nor did they provide any evidence of an adoption or legal guardianship of Ana.

¶9     While Michael and Wife were litigating their standing to participate in the juvenile court case, Wife's brother filed a separate petition for guardianship of Ana that alleged that Ana had a known mother, Mother. Wife's brother's petition was consolidated with the juvenile court case, and the juvenile court held a hearing on the petition. During the hearing, the juvenile court ordered genetic testing to determine whether Mother was Ana's mother and ordered one supervised visit between Ana and Wife's brother so DCFS could present its observations at the upcoming evidentiary hearing.

¶10 Mother testified via video from Mexico at the evidentiary hearing. However, the court stopped the questioning of Mother shortly after it began because it appeared that Mother was in distress. The court addressed concerns regarding Mother's safety and asked the Utah Attorney General's office to contact law enforcement in Mexico to assess Mother's safety. After a brief recess, Wife's brother moved to withdraw his petition for guardianship of Ana, and the court dismissed the petition with prejudice. With the dismissal of Wife's brother's petition for guardianship, Ana had no known family members, and the court determined that locating a permanent home placement would be appropriate. The juvenile court then set a termination of parental rights pretrial hearing for December 14, 2022.

¶11 On December 8, 2022, Mother filed a motion to intervene. The termination action was stayed pending resolution of the motion. Mother also filed a petition for parentage in the district court to have Michael adjudicated as Ana's father because he is listed as the father on the Mexican birth certificate. The district court consolidated the action with the termination proceedings in juvenile court.

¶12 After genetic testing established that Mother is Ana's biological mother, the court granted Mother's motion to intervene. The State amended its termination of parental rights petition to include Mother as the mother. The amended petition alleged that Mother substantially neglected Ana, was unable or unwilling to correct the circumstances that led to Ana's out-of-home placement, and made only token efforts to support or communicate with Ana.

*The Termination Trial*

¶13 The termination trial took place in the fall of 2023. The State called nine witnesses including a DHS Special Agent (Special Agent), three DCFS employees (DCFS Employee 1, 2, and 3),

Ana's therapist (Therapist), Mother, Michael, Wife, and Ana's foster mom.[5] Special Agent testified about the anonymous tip that led to DHS's investigation as described above. DCFS Employee 1 discussed the referral from DHS and the initial investigation into Michael and Wife, also as described above. DCFS Employee 2 discussed a conversation with Mother during DCFS's investigation, wherein Mother admitted that her plan was for Michael and Wife to adopt Ana because of her lack of means to support another child. DCFS Employee 2 also offered Mother reunification services, which Mother expressed interest in. DCFS Employee 3 discussed her work getting Ana into therapy and her visits to Ana with her foster family.

¶14 Therapist testified that she began working with Ana after Ana was placed in a foster home, when she was four-years-old. Therapist testified that when the juvenile court asked her to determine whether Ana was ready to have visits with Mother, Therapist decided to show Ana a photo of Mother so she could observe her reaction. Before showing Ana the photo of Mother, Therapist showed her photos of her foster mom, her foster dad, the foster family's dogs, Therapist, and a stranger. Ana had positive reactions to the photos of the dogs and foster mom and foster dad and neutral reactions to the photos of Therapist and the stranger. When Therapist showed Ana the photo of Mother, Ana said Mother's name and then "turned away" and "rolled into the fetal position." After showing Ana the image of the dog again,

---

5. Due to scheduling accommodations, the termination trial took place over six days in September, October, and November 2023. The juvenile court also held an evidentiary hearing on the petition for parentage on October 2, 2023. Mother, Special Agent, Michael, and Wife all testified at the evidentiary hearing. Because these same witnesses also testified at the termination trial, we do not separately recount their testimony at the evidentiary hearing here.

Therapist showed Mother's picture a second time and Ana responded, "go away."

¶15  When asked about Ana's relationship with her foster parents, Therapist stated she believed that Ana had a "secure anxious" attachment with her foster family, which she believed could improve over time. During cross-examination, Therapist testified that separating a child from their parents for something as typical as a military deployment could cause attachment issues for the child.

¶16  Mother, Michael, and Wife all testified that Michael and Mother met in San Diego, where Mother was working at a restaurant, while Michael was on a birthday trip with his parents, and during the trip Michael had an affair with Mother that led to Mother's pregnancy. The three also all testified that they had planned to co-parent Ana, with Ana living in the U.S. with Michael and Wife but remaining in touch with Mother through video calls, as they had been doing before DCFS got involved. However, differences in their testimonies and other evidence presented by the State exposed many holes in their story.

¶17  Although Mother testified that she met and had sexual relations with Michael while she was living in San Diego and working at a Mexican restaurant, Mother was unable to identify the dates when she lived in San Diego or the name of the restaurant. Mother testified that Michael and Wife did not give her any money for Ana and only paid her medical expenses. Mother testified that during the pregnancy, she was instructed by her coworker in Mexico, who was also Wife's friend, to use Wife's name as the patient on an ultrasound. Michael was not present for that ultrasound. Mother also testified that she was frequently in touch with Ana, Michael, and Wife through video calls and social media, but when Special Agent searched Michael's social media pursuant to a warrant, it showed no contacts with Mother. And

Mother has not provided child support or any financial or material support to Ana except for a few small gifts.

¶18   Michael testified that a few months after he had an affair with Mother, she contacted him on social media and told him she was pregnant.[6] Michael then testified that he told Wife about the affair and Mother's pregnancy, and Wife began speaking with Mother because Michael does not speak much Spanish and Wife is fluent in Spanish. Michael testified he did not financially support Mother during her pregnancy or pay her for Ana, but he did fly to Mexico a few weeks before Mother gave birth, and Wife gave Mother seventy-five to eighty dollars on a few occasions.

¶19   Michael testified that after Mother gave birth, he tried to get Ana a passport from the U.S. Embassy in Mexico, but after he was denied, he resolved to falsely claim that Ana was born at home in Utah to himself and Wife to get Ana a Utah birth certificate. Michael admitted he was convicted of possession of a fraudulent document for this conduct and spent sixty days in jail. Michael also testified that he pled guilty to sexual battery as the result of an incident where he touched his niece's buttocks because he mistook her for Wife. Michael was sentenced to two years of probation and was required to participate in sex therapy and counseling. On cross-examination, the guardian ad litem (the GAL) impeached Michael's account of how he met Mother with an audio recording from the sentencing hearing for his fraudulent document conviction. During the sentencing hearing Michael had stated, "We wanted to do adoption. Adoption is very difficult and expensive[,] something my wife and I cannot afford. We have a family friend who wanted us to raise her as our own but yet still be in her life."

---

6. Mother testified that she does not speak English and that she cannot read or write in either English or Spanish.

¶20 Wife testified that after Michael went on the birthday trip to San Diego, he told her that he had an affair with Mother and that she was pregnant. Wife further testified that she flew down to Mexico from Utah when Ana was born and then flew home to Utah a week later without Ana. Wife testified that she was not involved in getting the fraudulent Utah birth certificate for Ana, but she acknowledged the signature on the application looked like her signature.

¶21 Mother called nine witnesses during her case in chief. These witnesses included a clinical social worker, Michael's sister (Sister), two clients of Wife, a former coworker of Michael and Wife, Mother, two friends of Michael and Wife (Friend 1 and Friend 2), and a Mexican attorney.

¶22 The clinical social worker, who never met Ana in person, testified that Ana's reaction to the photo of Mother showed the existence of "a significant attachment" that Ana "doesn't know how to regulate." She further testified that "the fact that Ana was able to say her biological mother's name shows that she had consistent contact with her biological mom."

¶23 Sister testified that she knew Michael and their parents went to San Diego for Michael's birthday. She also testified that she witnessed video calls between Mother and Ana several times. Both of Wife's clients and the former coworker testified that they observed Ana speak with Mother on the phone.

¶24 Friend 1, who lived with Michael and Wife for a time, testified that he did not recall seeing Mother speak with Ana on the phone. Friend 2, who was present with Mother in Mexico during the court appearance via video where Mother appeared to be in distress, discussed the circumstances around the hearing. He stated that Michael asked him to help Mother with the video hearing because he was in Mexico on vacation and that Mother

seemed scared and intimidated by the proceedings. He stated he had not interacted with Mother since the video hearing.

¶25   The Mexican attorney gave testimony regarding the process of getting a Mexican birth certificate for a child and testified that even if the mother knew that the man signing the birth certificate was not the biological father, the birth certificate would still not be invalidated.

¶26   Meanwhile, in the separate evidentiary hearing on the petition for parentage, *see supra* note 5, the juvenile court requested a written closing from the parties focusing on what effect, if any, to give to the Mexican birth certificate. In their separate written closing arguments, both Mother and Michael argued that the juvenile court should recognize the Mexican birth certificate as if it were a birth certificate from a different U.S. state. Michael further argued that even if the juvenile court would not recognize the Mexican birth certificate directly, Michael putting his name on the Mexican birth certificate was a voluntary declaration of paternity under Utah Code section 78B-15-302(1). Finally, both Mother and Michael argued that the juvenile court should disregard the genetic testing, which showed that Michael is not the biological father.

¶27   The juvenile court heard closing arguments at the conclusion of the termination trial, where the State and the GAL argued that Mother had abandoned Ana, and Mother argued that the State had not met its burden to establish abandonment by clear and convincing evidence. Mother further argued that she had rebutted any such showing of abandonment.

*The Juvenile Court Rulings*

¶28   On December 20, 2023, the juvenile court issued two lengthy written orders. The first order denied the petition for parentage, and the second order terminated Mother's parental

rights. As an initial matter, the juvenile court found that Mother, Michael, and Wife "were not credible," noting that "[t]here were so many inconsistencies in the testimony" from these three witnesses "that it would be impossible to note them all." The juvenile court then discussed only the "more egregious examples," which included more than twenty specific findings.

¶29 In the order denying the parentage petition, the juvenile court found that Michael was not an alleged or presumed father under Utah law, and it declined to give full faith and credit to the Mexican birth certificate. The court declined to do so because the UUPA only provides full faith and credit to voluntary declarations of paternity from other U.S. states and it declined to apply the UCCJEA's definition of state that includes other countries like Mexico. The juvenile court also declined to disregard the genetic testing results.

¶30 In the order terminating Mother's parental rights, the juvenile court found that Mother's transfer of physical custody to Michael and Wife shortly after Ana's birth was an unregulated custody transfer because Mother had no prior relationship with Michael and Wife and Michael was not Ana's father. The juvenile court further concluded that Mother abandoned Ana because her conduct implied "a conscious disregard for . . . her parental obligations" and the "conduct led to the destruction of the parent-child relationship." Finally, the juvenile court determined that termination of Mother's parental rights was in Ana's best interest and strictly necessary because there was no parent-child relationship to preserve, no kinship option, and no less restrictive option that would equally protect Ana.

ISSUES AND STANDARDS OF REVIEW

¶31 Michael and Mother raise several issues on appeal. We first address the issues raised by Michael in his appeal of the juvenile

court's denial of the petition for parentage. Michael contends the juvenile court erred when it did not treat Ana's Mexican birth certificate as a "child custody determination made in a foreign country" under the UCCJEA. Michael also argues the juvenile court's interpretation of the UCCJEA creates absurd results, and this court should disregard the plain meaning of the statute. We review the juvenile court's decisions involving questions of statutory interpretation for correctness and "afford no deference to trial courts' decisions." *In re J.E.*, 2023 UT App 3, ¶ 14, 524 P.3d 1009.

¶32   Next, Michael argues in the alternative that the juvenile court erred in failing to treat Ana's Mexican birth certificate as a voluntary declaration of paternity under the UUPA and in failing to disregard the results of the genetic testing. Whether the juvenile court erred in failing to treat the Mexican birth certificate as a voluntary declaration of paternity under the UUPA is also a question of statutory interpretation that we review for correctness, "afford[ing] no deference" to the juvenile court's decisions. *Id.* Although neither this court nor our supreme court has identified the standard of review for a juvenile court's determination of whether to disregard genetic test results under Utah Code section 78B-15-608, we conclude that such a decision is entitled to deference unless it goes "against the clear weight of the evidence or leaves the appellate court with a firm and definite conviction that a mistake has been made." *In re A.H.*, 2024 UT 26, ¶ 43, 554 P.3d 969 (cleaned up). Using this deferential standard is appropriate because the decision involves a determination of the best interest of the child and is discretionary by statute. Utah Code § 78B-15-608(1)–(2) (providing that the "tribunal *may* disregard genetic test results that exclude the presumed or declarant father" and "shall consider the best interest of the child" (emphasis added)). And our supreme court has explained, the "juvenile court has a comparative advantage in its firsthand access to factual evidence" in conducting a "factually intense inquiry

dependent on the unique circumstances and needs of each child" as is required by the statute here. *In re A.H.*, 2024 UT 26, ¶ 43 (cleaned up).

¶33 We then address the issue raised by Mother in her appeal of the juvenile court's termination of her parental rights. Mother contends that the juvenile court erred in determining she abandoned Ana because the juvenile court failed to address the statutory grounds for a prima facie case of abandonment and she successfully rebutted them.[7] "The proper interpretation and application of a statute is a question of law which we review for correctness." *In re D.A.T.R.*, 2024 UT App 185, ¶ 32 (cleaned up). And "appellate courts may overturn a termination decision only when it is against the clear weight of the evidence or leaves the appellate court with a firm and definite conviction that a mistake has been made." *In re A.H.*, 2024 UT 26, ¶ 43 (cleaned up).

## ANALYSIS

### I. The Petition for Parentage

¶34 Michael contends that the juvenile court erred in not recognizing that "foreign proof of parentage—a Mexican birth certificate" was conclusive when adjudicating the petition for parentage. Michael argues that because both the UUPA and the UCCJEA are "silent as to the effect of a foreign birth certificate," the juvenile court should have filled this "gap" in the statutes and recognized that the Mexican birth certificate established Michael's

---

7. Mother also contends that the juvenile court erred in applying the UUCCTA retroactively. Because this issue was not preserved below, Mother asks us to review it for plain error and ineffective assistance of counsel. But we need not reach this issue because we affirm the juvenile court's decision on the ground that Mother abandoned Ana.

parentage because it confers custodial rights that make it a "child custody determination under the UCCJEA." Michael also argues that the juvenile court's interpretation of the UCCJEA leads to absurd results. For the reasons set forth below, we decline to address either of these arguments because they are unpreserved.

¶35 In the alternative, Michael argues that the juvenile court should have treated the Mexican birth certificate as a voluntary declaration of paternity under the UUPA and that the court's decision not to disregard genetic testing results that showed Michael was not Ana's biological father was against the clear weight of the evidence. We are not persuaded by either argument.

A.     The Mexican Birth Certificate and the UCCJEA

¶36 The UCCJEA governs how Utah courts recognize and enforce child custody determinations from other states and other countries. Utah Code §§ 78B-13-101 to -318. It requires Utah courts to give full faith and credit to both out-of-state custody determinations and those made by a foreign country. *Id.* §§ 78B-13-102(15), -105, -305. As set forth in the definitions section of the UCCJEA, a "'[c]hild custody determination' means a judgment, decree, or other order of a court providing for the legal custody, physical custody, or parent-time with respect to a child." *Id.* § 78B-13-102(3). Michael argues on appeal that "this [c]ourt should interpret the [UCCJEA] definition of 'child custody determination' broadly enough to include foreign birth certificates."

¶37 The GAL asserts that this issue was not preserved. "An issue is preserved for appeal when it has been presented to the [juvenile] court in such a way that the court has an opportunity to rule on it," which requires the issue to be "specifically raised in a timely manner" and "supported by evidence and relevant legal

authority." *State v. Johnson*, 2017 UT 76, ¶ 15, 416 P.3d 443 (cleaned up). "Although new *arguments*, when brought under a properly preserved issue or theory, do not require an exception to preservation, an argument based upon an entirely distinct legal theory is a new claim or issue and must be separately preserved." *True v. Utah Dep't of Transp.*, 2018 UT App 86, ¶ 32, 427 P.3d 338 (cleaned up).

¶38 In response to the GAL's preservation challenge, Michael does not claim any exception to our preservation requirement but instead claims that the "argument on appeal was made to the juvenile court: the Mexican birth certificate should be recognized as proof of paternity under Mexican law." But the general argument that the juvenile court should have accepted the Mexican birth certificate as proof of paternity is distinct from Michael's argument on appeal that the Mexican birth certificate is a child custody determination under the UCCJEA.

¶39 Michael presented a single argument regarding the UCCJEA to the juvenile court, which he made in his written closing arguments following the evidentiary hearing on the petition to establish parentage. Over the course of three sentences, Michael argued that the UCCJEA was "instructive on how Utah law handles issues of child custody across state and country lines" and that these "same principles" should be applied in this case. He never asserted that the Mexican birth certificate met the statutory definition of a "child custody determination" under the UCCJEA. Indeed, Michael affirmatively stated the opposite— "this is not a case applying the UCCJEA." Thus, Michael's argument on appeal that a Mexican birth certificate should be considered a child custody determination under the UCCJEA "presents an entirely distinct legal theory that needed to be preserved below." *Hillam v. Hillam*, 2024 UT App 102, ¶ 32, 554 P.3d 1137 (cleaned up).

¶40 And Michael failed "to present this distinct legal theory to the [juvenile] court in such a way that the court had an opportunity to rule on it." *Id.* ¶ 37 (cleaned up). Here, the juvenile court understood Michael's argument to only look to the UCCJEA by "analogy." In the order denying the petition for parentage, the juvenile court recounted Michael's argument as follows: "[Michael] urges the Court to find that Mexico is a state [under the UUPA] by using the [UCCJEA's] definition by analogy." Thus, neither the juvenile court nor the other parties had the opportunity to address the argument Michael now makes on appeal.[8]

¶41 Our preservation requirement "serves important policies of judicial economy and fairness." *True*, 2018 UT App 86, ¶ 26. Such "notions of fairness dictate that a party should be given an opportunity to address the alleged error in the trial court." *Id.* ¶ 27 (cleaned up). In addition to serving the important policies of judicial economy and fairness, the requirements "preserve the adversarial model, . . . and provide clear guidelines to litigants." *Id.* ¶ 28 (cleaned up). And while we can "exercise wide discretion when deciding whether to entertain or reject matters that are first raised on appeal, . . . we have limited our discretion to entertain unpreserved issues by creating exceptions to the general preservation rule." *Id.* (cleaned up). Accordingly, "if a party has not preserved an issue asserted on appeal, the party . . . must establish the applicability" of an exception to preservation. *Id.* ¶ 29 (cleaned up). Here, Michael made no attempt to do so. Therefore, because this issue is not preserved and Michael did not argue any preservation exception, we decline to consider it.

---

8. Moreover, none of the other parties had the opportunity to respond to Michael's "analogy" argument below because it was made in written closing statements that were filed simultaneously by all parties on the same date.

B.      The Absurdity Doctrine

¶42    Michael also argues that we should apply the absurdity doctrine in this case because no rational legislator could have intended the UCCJEA to exclude a foreign birth certificate. Specifically, Michael contends that the juvenile court's interpretation of the UCCJEA leads to absurd results for two reasons: (1) it would require the parents of a child with a foreign birth certificate to "adjudicate their parentage under Utah law or risk having their parental relationship disregarded" and (2) the juvenile court's interpretation conflicts with Mexican and international law. However, we decline to reach this issue because this argument was not preserved and Michael does not assert an applicable preservation exception. *See True*, 2018 UT App 86, ¶ 29.

¶43    As we noted previously, *see supra* ¶ 39, the only argument with respect to the UCCJEA that Michael presented to the juvenile court was that the UCCJEA was "instructive on how Utah law handles issues of child custody across state and country lines" and that these "same principles" should be applied in this case. And as best we can tell from the record, the word "absurd" was never mentioned by Michael or anyone else. But notwithstanding the failure to raise the absurdity doctrine before the juvenile court, our supreme court counsels that "[w]here the best reading of [the] statute[] is directly before [the court] on appeal, an absurdity analysis is an integral extension of our interpretive task." *Bagley v. Bagley*, 2016 UT 48, ¶ 26, 387 P.3d 1000. Here, however, the interpretation of the UCCJEA is not directly before us because Michael did not preserve a challenge to "the best reading" of the UCCJEA. *See supra* ¶¶ 37–41. Therefore, we likewise decline to reach Michael's challenge under the absurdity doctrine.

C.      Voluntary Declaration of Paternity

¶44    In the alternative, Michael contends that the Mexican birth certificate should have been considered a voluntary declaration of

paternity under the UUPA because he "substantively followed the steps to create a voluntary declaration of paternity when he had his name placed on [Ana's] birth certificate." Like the juvenile court, we have significant doubt as to whether a Mexican birth certificate could ever be a voluntary declaration of paternity under the UUPA because it does not meet the required elements as set forth in Utah Code section 78B-15-302.

¶45  However, even if we assume that the Mexican birth certificate was a voluntary declaration of paternity under Utah law, in order for Michael to obtain parental rights to Ana, the juvenile court must disregard the genetic test results to adjudicate Michael as Ana's father because Ana (through the GAL) properly challenged his voluntary declaration of paternity with genetic testing proving that Michael is not her biological father. *See* Utah Code § 78B-15-623(2) ("A child is not bound by a determination of parentage under this chapter unless: (a) the determination was based on an unrescinded declaration of paternity and the declaration is consistent with the results of genetic testing . . . ."); *see also In re J.E.*, 2023 UT App 3, ¶ 31, 524 P.3d 1009 ( "Section 623 gives a child the right to challenge a putative father's duly filed declaration of paternity on the basis that the declaration is inconsistent with genetic testing results").

¶46  In determining whether to "disregard genetic test results that exclude the . . . declarant father," the juvenile court "shall consider the best interest of the child, including the following factors:

> (a) the length of time between the proceeding to adjudicate parentage and the time that the . . . declarant father was placed on notice that he might not be the genetic father;
>
> (b) the length of time during which the . . . declarant father has assumed the role of father of the child;

(c) the facts surrounding the . . . declarant father's discovery of his possible nonpaternity;

(d) the nature of the relationship between the child and the . . . declarant father;

(e) the age of the child;

(f) the harm that may result to the child if . . . declared paternity is successfully disestablished;

(g) the nature of the relationship between the child and any alleged father;

(h) the extent to which the passage of time reduces the chances of establishing the paternity of another man and a child-support obligation in favor of the child; and

(i) other factors that may affect the equities arising from the disruption of the father-child relationship between the child and the . . . declarant father or the chance of other harm to the child."

Utah Code § 78B-15-608(1), (2)(a)–(i).

¶47   Here, the juvenile court considered each of these nine statutory factors. In doing so, the juvenile court's analysis of the required factors was thorough, was well-reasoned, and explained in great detail why, in considering Ana's best interests, each factor either weighed against disregarding the results of the genetic test or was neutral in the analysis.[9] *See id.* § 78B-15-608(2)(a)–(i).

---

9. Throughout both orders, the juvenile court judge provided detailed findings and extensive reasoning for her decision on

(continued…)

Michael challenges the juvenile court's assessment of seven of the factors, primarily asserting that the juvenile court did not sufficiently weigh in his favor his relationship with Ana during the first two and a half years of her life. And he faults the juvenile court proceedings for interfering with that relationship. These arguments are unpersuasive for several reasons.

¶48　First, much of the juvenile court's decision centered on its finding that Michael, Mother, and Wife were not credible and that their testimony about Ana's placement with Michael was not believable. We are required to give deference to such credibility findings. *In re E.R.*, 2001 UT App 66, ¶ 11, 21 P.3d 680 ("The juvenile court in particular is given a wide latitude of discretion as to the judgments arrived at based upon not only the court's opportunity to judge credibility firsthand, but also based on the juvenile court judges' special training, experience and interest in this field, and devoted attention to such matters."(cleaned up)).

¶49　Second, the fact that Ana was removed from Michael's care and, as a result, he was denied the ability to continue in the role of the father of Ana, does not turn any of the factors in Michael's favor. As our supreme court recently explained, "[a]llowing the best interest inquiry to become contaminated by extraneous discussions of blame and responsibility misses the point." *In re A.H.*, 2024 UT 26, ¶ 57, 554 P.3d 969. The relevant question is, "What outcome is in the child's best interest *now*?" *Id.* (cleaned up).

¶50　Finally, in assessing Ana's best interest, the juvenile court explained its concerns about Michael's conviction for sexually

---

complicated and novel legal issues. We commend this judge not only for her thorough analysis of these complex issues but also for working diligently to manage proceedings involving a multitude of witnesses from multiple countries.

abusing his female minor relative, his minimization of his conviction for fraudulently obtaining a Utah birth certificate for Ana, and the fact that "he lied in Court" about his relationship with Mother. Each of these were valid and proper considerations in determining Ana's best interest.

¶51 Thus, the juvenile court did not abuse its discretion in declining to disregard the test results because the decision was not against the clear weight of the evidence and it did not leave us with any belief—let alone a firm conviction—that a mistake had been made.

## II. Termination of Mother's Parental Rights

¶52 Before a court can terminate a parent's rights, it must (1) "find that at least one statutory ground for termination is present" and (2) "conclude that termination of the parent's rights is in the best interest of the affected child[]." *In re K.S.*, 2022 UT App 68, ¶ 46, 512 P.3d 497; *see also* Utah Code § 80-4-301(1). Both elements must be established by clear and convincing evidence. *See In re X.C.H.*, 2017 UT App 106, ¶ 34, 400 P.3d 1154. Abandonment is a permissible statutory ground for termination of parental rights. *See* Utah Code § 80-4-301(1) ("[T]he juvenile court may terminate all parental rights with respect to the parent if the juvenile court finds: (a) the parent has abandoned the child . . . .").

A. The Juvenile Court's Abandonment Findings

¶53 Mother makes two challenges to the juvenile court's finding that Mother abandoned Ana.[10] First, she contends that the juvenile court made an embedded legal error in its abandonment

---

10. Mother does not challenge the juvenile court's finding that termination was in Ana's best interest. Therefore, we address only the juvenile court's finding of abandonment.

analysis because it used the "general two-part test" from *In re T.E.*, 2011 UT 51, 266 P.3d 739, instead of establishing a prima facie case of abandonment pursuant to Utah Code section 80-4-302(1). Second, Mother contends that the State did not establish by clear and convincing evidence that Mother abandoned Ana. We find neither challenge persuasive.

¶54 A "showing of abandonment requires satisfaction of a two-part test. First, the petitioner must demonstrate that the respondent parent has engaged in conduct that implies a conscious disregard for his or her parental obligations. Second, the petitioner must show that the respondent parent's conduct led to the destruction of the parent-child relationship." *In re T.E.*, 2011 UT 51, ¶ 20 (footnote omitted). And as our supreme court has explained, this common law "definition of abandonment is supplemented by section 78A-6-508(1)(b)," which provides that it is "prima facie evidence of abandonment" if a parent engages in, or fails to undertake, the enumerated conduct. *Id.* ¶ 21. And "by establishing prima facie evidence of abandonment, a petitioner creates a presumption that the respondent parent has abandoned the child." *Id.* The "burden [then] shifts to the respondent parent to rebut the presumption." *Id.* ¶ 22. The statute cited in *In re T.E.* is now numbered section 80-4-302(1) and is the same statute relied upon by Mother. *See* Utah Code § 78A-6-508 (2021); *Id.* § 80-4-302(1). Because the common law test for abandonment set forth in *In re T.E.* is supplemented—not displaced—by the statutory definition of abandonment, it was not error for the juvenile court to ground its abandonment decision in the test set forth in *In re T.E.*

¶55 Next, having determined that the juvenile court applied the correct legal framework, we assess Mother's challenge to the juvenile court's determination that Mother abandoned Ana. Here, the juvenile court found that Mother abandoned Ana because she "consciously disregarded . . . her parental obligations" and "her

conduct has led to the destruction of the parent-child relationship." *Id.* ¶ 21. Specifically, the juvenile court found that Mother's periodic phone conversations with Ana and occasional gifts "with little to no chance of ever meeting [Ana] in person" was not "being a parent." The juvenile court found that these token gifts and limited interactions, along with Mother not providing any support or engaging in any of the normal duties of a parent, demonstrated "a conscious disregard for the parent-child relationship." The juvenile court also found Mother's conduct led to the destruction of the parent-child relationship because "there was no objective or credible evidence to support that [Mother] was going to have any real role in raising" Ana. These findings are sufficient to support the juvenile court's finding of abandonment by clear and convincing evidence. *See id.* ¶ 23.

¶56 Further, even if the juvenile court was required to establish that Mother abandoned Ana by the specific conduct set forth in section 80-4-302(1), there was ample evidence to do so. The third ground in the statute that demonstrates a prima facie case of abandonment occurs when a parent "fail[s] to . . . show[] the normal interest of a natural parent, without just cause." Utah Code § 80-4-302(1)(c). Here, the juvenile court found that Mother had not participated in any of the "day to day, month to month, or year to year duties of a parent," nor had she engaged with Ana in any way apart from periodic phone calls and sending two small gifts. Additionally, the juvenile court found that there was "little to no chance" Mother would ever see Ana in person again nor was there any "objective or credible evidence" to show that Mother would have "any real role in raising" Ana.

¶57 The juvenile court also found that Mother "never appeared emotionally invested in the case," seeming "bored and distracted," and specifically identified Mother's use of "the girl" to refer to Ana throughout the proceedings as indicative of a

person who was not "genuinely attached to and invested in [Ana]." Communicating with a toddler exclusively through periodic phone calls with no plans to see Ana in person or become more involved in the care or decision making for Ana demonstrates by clear and convincing evidence that Mother failed to show the normal interest of a natural parent under section 80-4-302(1)(c) and establishes a prima facie case of abandonment.

¶58 Mother also argues that even if a prima facie case of abandonment was established, she rebutted it. To successfully rebut the prima facie case of abandonment, parents "are not required to demonstrate by clear and convincing evidence that they did not abandon the child. Instead, they need produce only enough evidence to persuade the juvenile court that the petitioner seeking to terminate their parental rights has not established abandonment by clear and convincing evidence." *In re T.E.*, 2011 UT 51, ¶ 23. "After a respondent parent has presented evidence on rebuttal, the court must consider the totality of the evidence and determine if there is still clear and convincing evidence to support a finding of abandonment." *Id.*

¶59 Mother argues that she rebutted the abandonment finding because she "produced evidence that she believed that [Michael] was [Ana's] father" and that she "frequently communicated with [Ana], to the point that [Ana] could identify Mother as her mother when [Ana] was four years old." However, the juvenile court determined that neither Mother nor Michael were credible in their testimonies. And the juvenile court specifically found that their "story" that Mother and Michael had an affair that resulted in Mother's pregnancy with Ana was not credible.

¶60 Moreover, the juvenile court was unpersuaded that Mother "expressed a desire to have custody returned to her from the outset of this case" because "the abandonment occurred two years prior to the State's involvement" and "objective evidence"

demonstrated to the juvenile court that Mother did not "intend to establish a mother-child relationship with" Ana. Thus, the juvenile court's determination that Mother did not rebut the State's case for abandonment is not against the clear weight of the evidence, and we are not left with any conviction that a mistake was made. *See In re A.H.*, 2024 UT 26, ¶ 43, 554 P.3d 969.

CONCLUSION

¶61 With respect to Michael's appeal of the denial of the petition for parentage, we decline to address his argument under the UCCJEA because it was not preserved and we conclude that the juvenile court's decision to decline to disregard the genetic testing results that showed Michael was not Ana's biological father was not against the clear weight of the evidence.

¶62 Regarding Mother's appeal of the termination of her parental rights for abandonment, we conclude the juvenile court applied the correct legal framework and its decision was well-supported by the evidence.

¶63 Accordingly, we affirm the juvenile court's denial of the petition for parentage and termination of Mother's parental rights.

—————