*This opinion is subject to revision before final publication in the Pacific Reporter*

**2025 UT 11**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

STATE OF UTAH, in the interest of D.S. and K.S.,
persons under eighteen years of age

OFFICE OF GUARDIAN AD LITEM,
*Petitioner,*

*v.*

S.S. and STATE OF UTAH,
*Respondents.*

No. 20230877
Heard September 9, 2024
Filed April 24, 2025

On Certiorari to the Utah Court of Appeals

Third District Juvenile Court, Salt Lake County
The Honorable Annette Jan
No. 1198250

Attorneys:

Martha M. Pierce, Salt Lake City, for petitioner

Sheleigh A. Harding, Salt Lake City, for respondent S.S.

Derek E. Brown, Att'y Gen., Deborah A. Wood, John M. Peterson,
Asst. Att'ys Gen., Salt Lake City, for respondent State of Utah

JUSTICE PETERSEN authored the opinion of the Court, in which
ASSOCIATE CHIEF JUSTICE PEARCE, JUSTICE HAGEN, and
JUSTICE POHLMAN joined.

CHIEF JUSTICE DURRANT authored a dissenting opinion.

JUSTICE PETERSEN, opinion of the Court:

**INTRODUCTION**

¶1    The Division of Child and Family Services (DCFS) petitioned to terminate the rights of S.S. (Father) and J.S. (Mother) to their two children. At the time, DCFS had removed the children from Mother's custody, and Father was unavailable to care for the children because he was incarcerated. DCFS placed the children with their paternal grandmother (Grandmother), and they have been in her care ever since. The juvenile court has since terminated Mother's parental rights. This appeal concerns the juvenile court's subsequent termination of Father's parental rights. The juvenile court concluded that termination of Father's parental rights was strictly necessary to promote the children's best interests, which were best served by Grandmother adopting them.

¶2    Father appealed, arguing that the juvenile court erred in this determination. Father argued that the children's best interests were equally served by a permanent custody and guardianship arrangement with Grandmother, which would permit him to retain residual parental rights. The court of appeals agreed with Father, concluding that the juvenile court's decision "was against the clear weight of the evidence, and that the reasons upon which the court's analysis relied were insufficient to support termination of Father's rights." *In re D.S.*, 2023 UT App 98, ¶ 31, 535 P.3d 843. On this basis, it reversed the juvenile court's order terminating Father's parental rights.

¶3    The Office of the Guardian ad Litem (GAL) petitioned for certiorari. First, the GAL objects to the court of appeals' assessment of the juvenile court's best interest determination, arguing that the court gave insufficient deference to the juvenile court's determination and, consequently, misapplied the standard of review. Alternatively, the GAL argues that the court of appeals misapplied the statute governing parental termination. The GAL argues that the court's error stems from guidance we provided in *In re B.T.B.*, 2020 UT 60, 472 P.3d 827, which the GAL contends strays from the applicable statutory language. And it asks us to revisit our precedent and correct course.

¶4    We agree with the GAL's first argument. An appellate court may reverse a juvenile court's best interest determination only if it is against the clear weight of the evidence. Even if an appellate court views the evidence differently and would make a different determination, the juvenile court's best interest determination must stand unless it is against the clear weight of the

evidence. Here, we conclude that the juvenile court's best interest analysis is supported by the evidence in the record before it. Thus, although the court of appeals may have disagreed with the juvenile court's decision, it was error to overturn it. For this reason, we reverse.

## BACKGROUND

¶5 DCFS petitioned to terminate Father's parental rights to his two children, K.S. (14) and D.S. (8). We first provide a brief account of Father's history with the children. We then summarize the trial held before the juvenile court, its decision granting DCFS's petition, and the court of appeals' subsequent reversal of that decision.

¶6 Father lived with Mother, K.S., and D.S., until he and Mother had a "messy" breakup when the children were approximately eight and three years old, respectively. As Father described, the "relationship was not good for the children." And although the details are somewhat unclear from the record, Grandmother later testified that the children still struggle "with things that . . . happened to them when they were with their parents" during that time.

¶7 Even before their breakup, Mother had obtained a protective order against Father. Under the protective order, Father could not visit the children at Mother's residence. So Grandmother—Father's mother—would host Father and the children at her home.

¶8 But Father violated the protective order. He was arrested and charged with protective order violations and a subsequent count of possession of a dangerous weapon. He was ultimately sentenced to a prison term of zero to five years on these charges.[1]

¶9 Despite Father's incarceration, Grandmother insisted upon and facilitated weekly visits between him and the children. Some of these visits were over the phone, but the majority were by video call.

¶10 About a year and a half after Father was incarcerated, DCFS removed the children from Mother's custody after an incident during which she abandoned them. The children were

---

[1] At oral argument, the parties represented that Father has since been released.

adjudicated neglected as to Mother and dependent as to Father.[2] Based on that adjudication, and in light of Father's incarceration, the juvenile court placed the children in Grandmother's custody. The court eventually terminated Mother's parental rights, and it set a permanency goal of adoption.

¶11 The State also petitioned to terminate Father's parental rights. Father stipulated that there were statutory grounds for termination—specifically, that he was an unfit parent.[3] The juvenile court then held a trial to determine whether Father's parental rights should be terminated. Because it had already been established that there were statutory grounds to terminate Father's parental rights, the only issue that remained to be tried was whether termination was strictly necessary to promote the children's best interests.[4]

*Trial*

¶12 At trial, the court heard testimony from three witnesses: Grandmother, the assigned DCFS caseworker, and Father. The children did not testify.

---

[2] *See* UTAH CODE § 80-1-102(21), (58) (defining "dependent child" and "neglect" in the juvenile code).

[3] *See id.* § 80-4-301(1) (listing the statutory grounds for termination of parental rights).

[4] *See id.* § 80-4-104(12)(b) (requiring a determination of "whether termination . . . is strictly necessary to promote the child's best interest"). In 2024 the legislature amended section 80-4-104(12) to codify two concepts from existing caselaw. *See* Child Welfare Placement Review Amendments, H.B. 198 § 1, 2024 Leg., Gen. Sess. (Utah 2024) (adding language to indicate that the best interest analysis should be based on the "totality of the circumstances" and that parental rights should be terminated only when strictly necessary "to promote the child's best interest"); *see also In re J.M.*, 2020 UT App 52, ¶ 35, 463 P.3d 66 (explaining that "the best-interest . . . inquiry . . . asks a court to weigh the entirety of the circumstances . . . to determine what is in the best interest of the child under all of the circumstances"); *In re B.T.B.*, 2020 UT 65, ¶ 60, 472 P.3d 827 (explaining that "termination must be strictly necessary to promote the child's best interest"). Because the current version of the law and the 2021 version of the law supplemented with binding caselaw are substantially similar, we cite to the current version throughout for ease of readability.

¶13 Grandmother testified that she and the children "spend a lot of time together." Under her care, the children spend time doing chores, activities ("Cub Scouts," "ballet[,] or tumbling"), school work, and play time—something they had been working on because it had "been missing for them." They were "doing well in school" and "love[d] to learn." The children were helpful to friends and neighbors and, overall, were "really good kids."

¶14 But Grandmother still had concerns about the children— particularly D.S., the youngest. She recalled how, on one occasion, D.S. had been riding her bike and "came screaming in the house, shaking like a leaf" after encountering a man and woman "yelling at each other." "[I]t took a while," Grandmother said, for D.S. "to understand that . . . they weren't going to be able to get to her." Although D.S. no longer reacts this way, Grandmother said that D.S. still "worries" and "feels like she has to fix everything and . . . make it all right." As for K.S., Grandmother testified that he is "quieter," "very sensitive about things," and "pulls back and . . . away" whenever "he senses at all that . . . someone might be a little bit upset."

¶15 Grandmother also testified about the children's relationship with Father. She explained how, when the children talk about Father, "[t]hey say that he's not been around." In "K.S.'s words, he's scary."

¶16 Grandmother discussed the children's video visits with their incarcerated father and testified that the visits were "hard for [the children]." They had grown "less interested" in visits over time, to the point that Grandmother would "have to structure them" and help the children brainstorm things they could discuss with Father. Recently, the children had "not asked for visits." Grandmother would "have to insist" that they participate, "which [was] a little hard because D.S. [would] run[] into the bedroom" to avoid talking with Father. But K.S. did not "really want [visits] either." Grandmother said that K.S.'s "way to cope [was by] play[ing] the piano" for Father. That way, K.S. could avoid talking with Father, "even though he [had] things he kn[ew] he could talk about." Once visits were over, Grandmother would "have to spend some time kind of snuggling" the children. Grandmother credited Father's participation in the visits, noting that he was a good listener. But she testified, "I don't think he realizes how difficult it is for [the children] to do the visits."

¶17 When asked about whether she had discussed adoption with the children, Grandmother said that she and "their counselor" had talked with the children about it. She testified that, while the children "have some misconceptions about things, . . . we've tried to fix that." Grandmother testified that she was prepared to adopt them and make them a priority. And she explained that, as much as she loved her son, there had been a "number of times" over the years where "there was an opportunity for things to be different, and [Father] made the choice to continue the things that he was doing that were wrong."

¶18 At one point, Father's counsel asked Grandmother about "[w]hat kind of contact [she] would want him to have with the kids," assuming that he was released from prison, "sober[,] and responsible." Grandmother answered that "things are kind of up in the air about that." And when pressed about how she would handle the situation if the children asked to see him, Grandmother said:

> I'd ask for some guidance from people that know more than I do about that, because it really is about the kids for me. And—but I'm also not clairvoyant and I don't know everything. And so before I made any decisions about that, I would ask someone else. . . . Their therapist, their—you know, someone who is more of an expert than I am.

¶19 Father's counsel also asked whether Grandmother thought the children's relationship with Father was important. Grandmother responded:

> I think fathers are important when they're functioning properly. I don't think that this has been—I don't think this has functioned properly for a very long time. Whether it could or not, I don't know. A lot of that will depend on [Father].

¶20 The caseworker's testimony was generally consistent with Grandmother's. Having been involved with the family since the children were removed from Mother's custody, the caseworker testified that the children were "well cared for" by Grandmother and that the children "look[ed] to [Grandmother] as their family." Grandmother was "a stable placement" for the children and could "provide for the children permanently." With respect to the children's relationship with Father, the caseworker could not remember whether the children had ever said they were "afraid of

their dad or [that] they find him scary." "From [her] conversations with them," all the caseworker could say was that she "knew that they do love him." However, the children had told the caseworker that they wanted Grandmother to adopt them. And "based on [her] knowledge of the case" and her observations of the children, the caseworker believed that adoption was in their best interests.

¶21  Father testified that despite his incarceration, he still had a strong bond with the children. He and K.S. had "a lot of the same interests," including music. Father said that K.S. "love[d] playing piano . . . and telling [him] about the piano"—something Father wished they could do together. When asked about whether K.S. "ever seem[ed] withdrawn in the visits," Father remarked:

> I've never felt that way. I've never felt like— sometimes I ask him like, "So what else is going on with you?" And he'll be like, "Oh, I don't know." I'll be like, "Tell me a story." He goes, "I don't really have a story to tell right now." But—so that does happen, but we usually—he starts playing the piano. When it comes to music, me and him are like in sync.

¶22  Father also felt close with D.S., who he said "loves to act" and "draw." But Father noticed that D.S. "get[s] upset sometimes." He testified:

> I feel like she gets upset because I can't be there with her, and that's what makes her want to recluse kind of. Because I'm not able to hold her. She's wanting the physical touch. . . . So—and I can't do that. It's over the phone. So, yeah, it makes it difficult.

¶23  As for the video calls in general, Father rejected the idea that visits had been uncomfortable for the children. He acknowledged, however, that visits had been awkward for various reasons—for example, there were sometimes other inmates in the background and audio issues.

¶24  Father's counsel asked him "what would [he] do" if he "were in charge of designing what happens" with him and the children after his release from prison. Father answered that he envisioned having "a stronger relationship" with the children. He saw himself "go[ing] to church with them every week," "go[ing] to the park with them," and living near them. He acknowledged that "having custody . . . isn't even likely, because I have a lot of stuff to deal with, getting a job, things like that." He explained that he had "[immigration] issues," which included a "deportation order" that

he believed would not be enforced, and "no money." But he said that he "would work hard" and "find a way to make it work."[5]

*Termination Order*

¶25  After trial, the juvenile court concluded that termination was strictly necessary to promote the best interests of the children because it would allow for their interests to take precedence over Father's residual parental rights and for them to be adopted by Grandmother. So, the court ordered Father's parental rights to be terminated. And it laid out a constellation of reasons for its decision.

¶26 Fundamentally, the juvenile court found that Father's "past and current involvement with his children ha[d] been unstable and inconsistent but for [G]randmother's assistance." The court found that Father recognized "that upon release, there are still outstanding questions as to his ability to gain employment, sobriety, find appropriate living arrangements, and deal with his immigration/deportation issue," and that Father "concede[d] he would be in no position to assume custody of the children."[6] Accordingly, the court found that Father's "future involvement" in the children's lives was "uncertain."

---

[5] During this discussion, the trial transcript indicates that there was a two-minute break in the audio recording. When the recording picked up again, Father's direct examination had ended and he was being cross-examined.

[6] We note that some of the court's findings on this point do not appear in the transcript of Father's testimony—for example, the transcript does not indicate that Father discussed his sobriety or potential difficulty finding living arrangements. However, as noted above, there is a two-minute gap in the recording of this portion of Father's direct examination. *See supra* ¶ 24 n.5. Father has not challenged the court's findings in this respect. So we presume that these findings were adequately supported. *See In re Adoption of Connor*, 2007 UT 33, ¶ 16, 158 P.3d 1097 ("Unless an [appellant] meets the burden of demonstrating the failure of the evidence to support the action taken by the trial court, we assume the evidence and process employed were sufficient."); *see also State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278 ("When crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." (cleaned up)).

¶27 The juvenile court also found that the children "no longer appear[ed] to benefit" from visits with Father. It credited Grandmother's testimony that "the children become avoidant and anxious" when it comes to the video calls and that they "state they do not want visits[] and seek post visit snuggles with her." The court also stated that "[G]randmother's testimony that she must help structure and prepare the children for . . . [F]ather's upcoming visits further supports that the children derive much less from their visits than . . . [F]ather believes."

¶28 Relatedly, the juvenile court voiced concerns about Father's lack of awareness of "how difficult the visits are for the children." It explained that Father's "failure to recognize that the children do not really talk about him and do not want to visit with him raises questions as to whether he could act in the children's best interest" moving forward. The court stated that "[t]he fact . . . [F]ather believes his children enjoy the visits . . . is exactly why a permanent custody and guardianship neither protects nor benefits the children."

¶29 The juvenile court further observed that such an arrangement left the children "vulnerable to their father's residual parental rights"—in that Father would "have the ability to compel continued contact." Father had testified that he intended to seek "as much visitation as possible with his children" once released from prison. And that, in the court's view, would "negatively impact the children." But adoption by Grandmother would "benefit[] the children" because it would "afford[] them the protection of ensuring that any future assessment of contact" with Father would be based on the children's specific "needs and desires" rather than the requirements of Father's residual parental rights.

¶30 Finally, the juvenile court noted that the children had finally "secured stability" with Grandmother, a "loving and committed caregiver." The court recounted how "[t]he children came to [DCFS's] attention through . . . [M]other's neglectful actions," and how, "[w]hen the children needed their father the most, he was unable to provide for them" due to his incarceration. The children had "endured instability in who provide[d] for them and who they [could] rely upon." "Fortunately," the court said, Grandmother had been "ready, willing, and able to have the children placed with her." And as they "settled in with . . . [G]randmother, they ha[d] conveyed their desire to lessen . . . [F]ather's involvement in their lives."

¶31 The juvenile court therefore concluded that termination was strictly necessary because there were "no other legal options other than termination . . . that serve the children's best interests." Based on that conclusion, the court ordered Father's parental rights to be terminated, allowing Grandmother's adoption of the children to move forward.

*Appeal*

¶32 Father appealed, arguing that the juvenile court erred in concluding that termination was strictly necessary. The court of appeals agreed with Father, determining "that the juvenile court's decision in this case was against the clear weight of the evidence, and that the reasons upon which the court's analysis relied were insufficient to support termination of Father's rights." *In re D.S.*, 2023 UT App 98, ¶ 31, 535 P.3d 843.

¶33 The GAL petitioned for certiorari, which we granted. We have jurisdiction under Utah Code section 78A-3-102(3)(a).

**ISSUE AND STANDARD OF REVIEW**

¶34 The GAL argues that the court of appeals erred in reversing the juvenile court's order. "On certiorari, this court reviews the decision of the court of appeals for correctness . . . ." *Donovan v. Sutton*, 2021 UT 58, ¶ 15, 498 P.3d 382 (cleaned up). "[A]ppellate courts may overturn a termination decision only when it is against the clear weight of the evidence or leaves the appellate court with a firm and definite conviction that a mistake has been made." *In re A.H.*, 2024 UT 26, ¶ 43, 554 P.3d 969 (cleaned up).

**ANALYSIS**

¶35 The GAL's primary contention is that the court of appeals failed to give sufficient deference to the juvenile court's best interest determination and impermissibly reweighed the record evidence in a de novo fashion. The GAL also argues that the court of appeals' best interest analysis "strayed from the [applicable] statutory scheme" in various ways. It traces this error to guidance we provided in *In re B.T.B.* about how to conduct the best interest analysis. *See* 2020 UT 60, 472 P.3d 827. Accordingly, the GAL argues that we should reconsider some of our analysis in that case.

¶36 We conclude that the GAL's first argument is dispositive. The juvenile court's best interest determination was supported by the evidence, and the court of appeals erred in reversing the juvenile court's termination order. Because we decide the case on

this basis, we do not resolve the GAL's other arguments. However, in our discussion of the applicable law, we take the opportunity to address some of the GAL's primary objections to *In re B.T.B.*

I. THE STRICTLY NECESSARY ANALYSIS MUST FOCUS ON THE CHILD'S BEST INTEREST, VIEWED FROM THE CHILD'S PERSPECTIVE

¶37 When deciding a termination petition, the juvenile court conducts a best interest analysis only after finding "that there are [statutory] grounds for termination" of a parent's rights. *In re A.H.*, 2024 UT 26, ¶ 31, 554 P.3d 969 (citing UTAH CODE § 80-4-301(1)). Here, Father stipulated that there were grounds to terminate his parental rights because he was an unfit parent. So the only question before the juvenile court at trial was whether termination was "strictly necessary to promote the [children's] best interest." UTAH CODE § 80-4-104(12)(b).

¶38 In conducting a best interest analysis, a juvenile court must weigh the "totality of the circumstances" from "the child's point of view." UTAH CODE § 80-4-104(12)(b). In other words, having already concluded that there are statutory grounds for termination, "the court's focus should be firmly fixed on finding the outcome that best secures the child's well-being." *In re B.T.B.*, 2020 UT 60, ¶ 64. The juvenile code does require the court to consider whether "sufficient efforts were dedicated to reunification," and whether "the efforts to place the child with a relative who has, or is willing to come forward to care for the child, were given due weight." UTAH CODE § 80-4-104(12)(b)(i)–(ii). But "[o]utside of [these] factors . . . , the best interest analysis must focus on the children and their current circumstances." *In re A.H.*, 2024 UT 26, ¶ 56.

¶39 Because termination is permissible only when "strictly necessary to promote the child's best interest," UTAH CODE § 80-4-104(12)(b), the juvenile court must consider whether "the child can be equally protected and benefited by an option other than termination," *In re B.T.B.*, 2020 UT 60, ¶ 66. If other available options equally promote the child's best interest, then termination is not "strictly necessary." *See id.*

¶40 The GAL objects to some of our caselaw analyzing the "strictly necessary" requirement—in particular, *In re B.T.B.*, 2020 UT 60. We do not resolve all of those objections here, because it is unnecessary to the resolution of this case. But we discuss some of the GAL's core concerns.

¶41 The GAL argues that in *In re B.T.B.*, we erroneously tethered the best interest determination to legislative policy

declarations found in Utah Code section 80-4-104. In section 104, the legislature lists a number of "protections and requirements" that termination is "[s]ubject to." UTAH CODE § 80-4-301(1) (citing *id.* § 80-4-104). The GAL argues that those protections apply only to a fit parent and become inapplicable once a court has found grounds for termination, so we were wrong to discuss them in *In re B.T.B.* in the context of the best interest analysis. Whether or not the GAL's premise is correct, this critique rests on a false dichotomy between parental rights and a child's best interest because, as we made clear in *In re B.T.B.*, once grounds for termination have been found, the statute creates no conflict between the two. It makes clear that the child's best interest is of "paramount importance." *Id.* § 80-4-104(12)(a). Thus, the child's best interest is in first position, and we have interpreted the statute accordingly. As we explained in *In re B.T.B.*,

> [W]e reject the proposition that the juvenile court is to, at the best interest stage, weigh a parent's constitutional rights against the child's welfare and best interest. If a court has adhered to the statutory framework, a parent's constitutional rights will have received substantive and procedural protections throughout the process. And the parent's constitutional rights will continue to receive protection during the best interest inquiry through the strictly necessary requirement and the clear and convincing standard. But when the court considers a child's welfare and best interest, the court's focus should be firmly fixed on finding the outcome that best secures the child's well-being.

2020 UT 60, ¶ 64.

¶42 The GAL also criticizes our statement in *In re B.T.B.* that "a court must start the best interest analysis from the legislatively mandated position that 'wherever possible, family life should be strengthened and preserved.'" *Id.* ¶ 66 (cleaned up). We were quoting section 80-4-104(12)(a) of the statute, which states in full that,

> Wherever possible, family life should be strengthened and preserved, but if a parent is found, by reason of the parent's conduct or condition, to be unfit or incompetent based upon any of the grounds for termination described in this part, the juvenile

court shall then consider the welfare and best interest of the child of paramount importance in determining whether termination of parental rights shall be ordered.

UTAH CODE § 80-4-104(12)(a).

¶43 Our statement that the best interest analysis should start with this presumption must be read in context. We did not mean that preserving family life is a coequal focus of the best interest analysis. Rather, we made this statement in the context of discussing the statute's declaration that, "'it is in the best interest and welfare of a child to be raised under the care and supervision of the child's natural parents,' and that a 'child's need for a normal family life in a permanent home, and for positive, nurturing family relationships is usually best met by the child's natural parents.'" *In re B.T.B.*, 2020 UT 60, ¶ 65 (quoting UTAH CODE § 78A-6-503(8) (2020) (current version at *id.* § 80-4-104(8))). Thus, once grounds for termination have been found, the goal of preserving family life must be subordinate to and in service of the child's best interest. So, to be clear, at the best interest stage, the potential for reunification is viewed from the child's perspective—including the child's recognized "right . . . to be reared by the child's natural parent"— not from the parent's perspective. UTAH CODE § 80-4-104(4)(b).

¶44 With this in mind, we turn to our analysis of the court of appeals' reversal of the juvenile court's decision.

II. THE COURT OF APPEALS ERRED IN REVERSING THE JUVENILE COURT'S TERMINATION DECISION

¶45 Before the juvenile court were two options for the children: adoption by Grandmother, which would necessitate termination of Father's parental rights; or a permanent guardianship with Grandmother, which would allow Father to maintain "[r]esidual parental rights," including "reasonable parent-time" with the children. *See* UTAH CODE § 80-1-102(70)(a). The court concluded that terminating Father's parental rights was strictly necessary because it was in the children's best interests for Grandmother to adopt them. It determined that the children "no longer appear[ed] to benefit" from contact with Father, noting that "the children became avoidant and anxious" when it came time for visits, resisted participating, and required "post visit snuggles." The court also reasoned that Father's inability to recognize "how difficult the visits" were for the children raised doubts as to "whether he could act in the children's best interest" moving forward. Further,

adoption would benefit the children by "ensuring that any future assessment of contact" with Father would be based on the children's "needs and desires"—given Grandmother's commitment to "seek guidance regarding the appropriateness for each child." And given how the children had already "endured instability in who provide[d] for them and who they [could] rely upon," the juvenile court reasoned that it was in the children's best interests to preserve the stability they had finally obtained with Grandmother. Based on these considerations, the juvenile court concluded that the children's best interests were best served by adoption, and that the permanent guardianship Father proposed was not on equal footing. Accordingly, the court concluded that termination was strictly necessary.

¶46 As the GAL points out, an appellate court may overturn a juvenile court's best interest determination "only when it is against the clear weight of the evidence or leaves the appellate court with a firm and definite conviction that a mistake has been made." *In re A.H.*, 2024 UT 26, ¶ 43, 554 P.3d 969 (cleaned up). In other words, the juvenile court must have "either failed to consider all of the facts" or, despite considering all relevant facts, reached a conclusion "against the clear weight of the evidence." *In re E.R.*, 2021 UT 36, ¶ 31, 496 P.3d 58 (cleaned up). The GAL argues that the court of appeals did not give appropriate deference to the juvenile court's best interest decision, and instead reweighed the evidence before the juvenile court.

¶47 Applying the standard of review to the facts here, we cannot say that the juvenile court's best interest determination was against the clear weight of the evidence. Rather, there was evidentiary support for each of the factual findings underlying the juvenile court's determination—including testimony regarding the children's history prior to being placed in Grandmother's care, their anxieties about and behavior during visits with Father, Father's lack of awareness of how difficult the visits were for the children, the bonds that had formed between the children and Grandmother, and the stability the children had found with Grandmother after years of instability. As for its analysis of the children's best interests, the juvenile court considered a variety of factors from the children's perspective that were based on the evidence before the court. And in light of those considerations, the juvenile court determined that the permanent guardianship arrangement proposed by Father would not equally serve the children's best interests compared to adoption. That type of

analysis is consistent with the juvenile code's directives as to how courts should make a best interest determination.

¶48 The court of appeals concluded otherwise, taking issue with various aspects of the juvenile court's decision. We now examine some of the court of appeals' concerns and explain why they do not warrant reversal of the juvenile court's termination order.

¶49 To begin, the court of appeals cast the juvenile court's determination "that the [c]hildren needed stability" as the type of "categorical" concern about the benefits of adoption that cannot support a termination decision. *In re D.S.*, 2023 UT App 98, ¶¶ 20–21, 535 P.3d 843 (citing *In re J.A.L.*, 2022 UT 12, ¶ 24, 506 P.3d 606). For context, in *In re J.A.L.*, we cautioned juvenile courts against relying on the "categorical" benefits of adoption—i.e., greater stability and permanency—in the best interest analysis. 2022 UT 12, ¶ 24. The problem is that, if those "categorical concerns were enough, termination and adoption would be strictly necessary across the board." *Id.* The dissent agrees with the court of appeals on this point. *See infra* ¶¶ 72–73.

¶50 Crucially, however, we have never precluded juvenile courts from "taking the differences between permanent guardianship and adoption into account," *In re A.H.*, 2024 UT 26, ¶ 69, so long as the reasoning is case specific. Here, for instance, although the juvenile court determined that adoption would provide greater stability for the children (something that is generally true of adoptions when contrasted with permanent guardianships), it ultimately based its determination on the specific needs of these children. The court noted that while under the care of Mother and Father, they had "endured instability in who provide[d] for them and who they [could] rely upon." The children had lived with Mother and Father under circumstances that Father described as "not good for the children." At some point, Mother obtained a protective order against Father and he was not permitted at the family residence; Father violated the protective order and was then incarcerated—and therefore unavailable to the children; and then Mother had her parental rights terminated after an incident when she abandoned them. Once placed with Grandmother, however, the children "secured stability" and "a sense of family." The juvenile court concluded that allowing "further disruption" would be detrimental to those interests.

¶51 This type of case-specific analysis is not the sort of categorical comparison that we cautioned against in *In re J.A.L.* And we emphasize that here, the juvenile court's recognition of the children's particular need for the stability that adoption by Grandmother would provide was a valid, individualized ground for the court's best interest determination. We have also clarified that while the "categorical differences [between adoption and permanent guardianship] cannot be dispositive in and of themselves, . . . they can be one of the many factors evaluated in the particularized best interest analysis." *In re A.H.*, 2024 UT 26, ¶ 69, (discussing *In re J.A.L.*, 2022 UT 12, ¶ 25). So even assuming that the juvenile court's permanency concerns were not case specific, the "many [other] factors" the juvenile court considered in its best interest analysis would make up for this purported error. *See id.*

¶52 The court of appeals also rejected the juvenile court's conclusion that adoption would serve the children's best interests because Grandmother, not Father or the court, would be the decisionmaker as to how much contact the children would have with Father. *See In re D.S.*, 2023 UT App 98, ¶¶ 23–28. In the juvenile court's words, "Adoption benefits the children as it affords them the protection of ensuring that any future assessment of contact with their father will [be] considered solely from their respective points of view." The alternative, a permanent guardianship arrangement, would therefore "fail to ensure adequate protections," because Father would retain his residual rights, including reasonable parent-time.

¶53 The court of appeals viewed the evidence differently. It "acknowledge[d] that, in some cases, fear of a parent's residual rights might reasonably counsel in favor of terminating that parent's rights so that an adoption can take place." *Id.* ¶ 23. "But this case is not one of those cases," the court of appeals explained, "[g]iven Father's genuine efforts to maintain a meaningful relationship with the [c]hildren, as well as the absence of a 'harmfulness' component to that relationship." *Id.* ¶¶ 23, 27. As the court of appeals noted, "there were no allegations of abuse or neglect regarding Father," *id.* ¶ 24 (cleaned up); Father had "made a credible and determined effort to remain involved in the [c]hildren's lives despite his incarceration," *id.* ¶ 25; and "[i]t seem[ed]" any difficulties the children experienced around visits were attributable to the inherent challenges of "communicating and bonding" with Father while he was in prison, *id.* ¶ 26.

¶54 We conclude that the juvenile court's decision that it was in the children's best interests to give Grandmother the authority to determine the amount and nature of their contact with Father was supported by the evidence.

¶55 With respect to the "harmfulness" of the children's relationship with Father, the court of appeals downplayed the juvenile court's findings about how difficult visits were for the children. The court of appeals stated that "[t]he most anyone [could] say regarding any downside to these visits is that the [c]hildren find them boring or 'uncomfortable' because they sometimes see other inmates in the background and because they do 'not know what to do' during the visits." *Id.* And it seemed to the court of appeals that any difficulty the children experienced arose "simply from the fact that Father is in prison." *Id.*

¶56 But the evidence before the juvenile court showed that the children's negative responses to contact with their Father went beyond mere boredom or discomfort with the prison setting of the calls. Grandmother testified about how the children did not want to participate in and avoided visits. D.S. would hide in her room. And K.S. would play the piano during visits to avoid discussing things "he kn[ew] he could talk about" with Father. They would need to "snuggle" with Grandmother after the visits.

¶57 And the evidence suggested that the children's hesitance to participate in visits with Father was not an isolated response to the visits in particular, but a symptom of the children's remaining struggle with "things that . . . happened to them when they were with their parents," and K.S.'s perception of Father as "scary."

¶58 This is not to say that the court of appeals' contrary view does not also find some support in the evidence. But whether an appellate court would draw the same conclusions from the evidence that the juvenile court did is not what the relevant standard of review asks.[7] *See In re A.H.*, 2024 UT 26, ¶ 44 ("An

---

[7] This is what we mean when we refer to an appellate court improperly "reweighing" the record evidence. The dissent notes that "There is no universal bar on an appellate court 'reweighing' evidence considered by the juvenile courts. After all, the command that appellate courts determine if the lower court's decision is 'against the clear weight of the evidence' indicates some weighing is required." *Infra* ¶ 69 (first quoting *In re E.R.*, 2021 UT 36, ¶ 31, 496

(continued . . .)

appellate court reviewing a termination decision should not perform its own independent reweighing of the evidence to decide how it would have resolved the matter in the first instance." (cleaned up)). There are good reasons why appellate courts grant deference to a juvenile court's best interest determination. A juvenile court has had the opportunity to observe the testimony and assess the respective credibility of the witnesses. And it generally has had the opportunity to see the case progress over many months, if not years, and gain additional insight into the potentially complex family dynamics at play. This is why appellate courts set aside these determinations only when they are against the clear weight of the evidence. *See In re E.R.*, 2021 UT 36, ¶ 31.

¶59 The juvenile court's concerns about Father's residual rights had more to do with ensuring that the extent and nature of the children's contact with Father was based on the children's needs, desires, and best interests—rather than Father's. Under a permanent guardianship, Father would be entitled to "reasonable parent-time." *See* UTAH CODE § 80-1-102(70)(a)(iv). And as the court of appeals observed, if Grandmother determined it was in the children's best interests to limit Father's parent-time under that arrangement, she would need to seek court intervention. *See In re D.S.*, 2023 UT App 98, ¶ 22. As the juvenile court saw it, the children would therefore "have very little agency" over how much contact they would have with Father. On the other hand, the juvenile court found that Grandmother was dedicated to the children, would prioritize their interests, and would "seek guidance" from the children's therapists regarding how much contact they ought to have with Father. In making these findings, the juvenile court was

---

P.3d 58; and then quoting *In re A.H.*, 2024 UT 26, ¶ 44, 554 P.3d 969 (cleaned up)). But this standard of review does not invite an appellate court to assess whether it agrees with the juvenile court's best interest determination, nor whether it would reach the same determination as the juvenile court. Rather, a juvenile court's best interest determination is against the clear weight of the evidence only when an appellate court is left "with a firm and definite conviction that a mistake has been made," *In re A.H.*, 2024 UT 26, ¶ 43 (cleaned up), or where it concludes that the juvenile court "either failed to consider all of the facts" or, despite considering all relevant facts, has reached a conclusion "against the clear weight of the evidence." *In re E.R.*, 2021 UT 36, ¶ 31 (cleaned up). A difference of opinion is not sufficient.

properly focused on viewing the evidence from the children's point of view.

¶60 The court of appeals rejected the juvenile court's determination because the court of appeals gave more weight to the evidence of Father's efforts to maintain his relationship with the children. The court of appeals reasoned that, "[a]s a general matter, we *want* parents to exhibit a commitment toward a positive and continued relationship with their children." *Id.* ¶ 27. It further stated, "Father should be commended—rather than chided—for maintaining love and affection for, and a desire to continue a meaningful relationship with, the [c]hildren despite his incarceration." *Id.*

¶61 We don't disagree with these observations, but in this case, they skew more toward Father's perspective than the children's perspective. We can see how, for a child, maintaining ties with a parent who has made "credible and determined effort[s]" to foster their relationship would often weigh against termination. *Id.* ¶ 25. But, "from the child's point of view," UTAH CODE § 80-4-104(12)(b), it is irrelevant whether Father deserves to be praised or chided for his efforts, *see In re A.H.*, 2024 UT 26, ¶ 57 ("Allowing the best interest inquiry to become contaminated by extraneous discussions of blame and responsibility misses the point."). Courts must instead ask, simply, "what outcome is in the child's best interest now?" *Id.* (cleaned up).

¶62 In this case, with all the evidence before it, the juvenile court determined that the children's needs, desires, and best interests would be best protected by allowing Grandmother, rather than Father with his attendant residual parental rights, to determine the children's contact with Father. We overturn the juvenile court's decision only when it is against the clear weight of the evidence—not when we would simply weigh the same evidence differently. Accordingly, while the court of appeals' view of the evidence may be valid, it did not identify "significant flaws in [the juvenile court's] reasoning" or "specific facts in the record that the juvenile court had misunderstood or failed to consider" that could "tip[] the scales in the other direction" such that we can say the juvenile court's decision was against the clear weight of the evidence. *Id.* ¶ 65. Further, the juvenile court kept its best interest analysis trained on the children's perspective, not Father's perspective. That was correct.

¶63 Finally, the court of appeals "put almost no stock in the juvenile court's finding that the [c]hildren 'expressed a desire to be adopted by' Grandmother," because the juvenile court made no finding that the children were "of sufficient capacity to express [their] desires"—a prerequisite to considering "the child's desires regarding . . . termination" in the best interest analysis. *In re D.S.*, 2023 UT App 98, ¶ 29 (quoting UTAH CODE § 80-4-303(1)(a)). Further, although the caseworker had testified that the children wanted to be adopted by Grandmother, the court of appeals reasoned that this testimony did not support a finding regarding the children's desires. *See id.* ¶ 30. In the court of appeals' view, there was no "testimony that . . . either of the [c]hildren actually understood and appreciated the distinction between adoption and guardianship, and that, based on that understanding, they preferred adoption." *Id.*

¶64 The GAL argues that the court of appeals erred in reaching this issue, because Father did not raise it in the juvenile court nor the court of appeals. The GAL is correct. Father did not object to the juvenile court's consideration of the children's desires on this basis; nor did he raise this issue in the court of appeals. The issue was therefore unpreserved in the juvenile court and waived on appeal. And absent a challenge to the juvenile court's finding, the court of appeals should not have disregarded the finding in its analysis. *See Ahhmigo, LLC v. Synergy Co. of Utah,* 2022 UT 4, ¶ 16, 506 P.3d 536 ("An appellant must properly preserve an issue in the district court before it will be reviewed on appeal." (cleaned up)); *State v. Johnson*, 2017 UT 76, ¶ 16, 416 P.3d 443 (explaining that an issue is waived "[w]hen a party fails to raise and argue [it] on appeal"). In any event, even if we were to completely discount the juvenile court's finding that the children desired adoption, it would not change our resolution of this case because the juvenile court's best interest determination was supported by other evidence.

¶65 In sum, we disagree with the court of appeals that the juvenile court's best interest determination was against the clear weight of the evidence. While other inferences and conclusions could have been drawn from the evidence, those made by the juvenile court were supported by its factual findings and the evidence before it.

## CONCLUSION

¶66 Because the juvenile court's best interest determination was supported by the evidence, we reverse.

CHIEF JUSTICE DURRANT, dissenting:

¶67 It should be a rare case where terminating parental rights is strictly necessary. And based on the juvenile court's factual findings, I agree with the court of appeals that this case doesn't seem to be one. Because I believe permanent guardianship in this case would protect the children as well as adoption would, and because a permanent guardianship here would respect the legislature's clear mandate to protect familial relationships when possible, I respectfully dissent.

¶68 Before terminating parental rights, a juvenile court must find that termination, "from the child's point of view, is strictly necessary to promote the child's best interest."[8] As part of the strictly necessary analysis, the juvenile court must determine whether "the child can be equally protected and benefited by" any arrangement other than termination and adoption.[9] And as the majority points out, "[if] other available options equally promote the child's best interest, then termination is not 'strictly necessary.'"[10]

¶69 Appellate courts may overturn a termination decision only when it is "against the clear weight of the evidence or leaves the appellate court with a firm and definite conviction that a mistake has been made."[11] The majority suggests that in reaching its conclusion, the court of appeals inappropriately reweighed the record evidence. I disagree. "There is no universal bar on an appellate court 'reweighing' evidence considered by the juvenile courts."[12] "After all, the command that appellate courts determine if the lower court's decision is 'against the clear weight of the evidence' indicates that some weighing is required."[13] Inherent in the "clear weight of the evidence" standard is a large dollop of

---

[8] UTAH CODE § 80-4-104(12)(b).

[9] *In re B.T.B.*, 2020 UT 60, ¶ 66, 472 P.3d 827.

[10] *See supra* ¶ 39 (citing *In re B.T.B.*, 2020 UT 60, ¶ 66).

[11] *In re A.H.* 2024 UT 26, ¶ 43, 554 P.3d 969 (cleaned up).

[12] *In re E.R.*, 2021 UT 36, ¶ 31, 496 P.3d 58.

[13] *In re A.H.*, 2024 UT 26, ¶ 44 (quoting *In re E.R.*, 2021 UT 36, ¶ 7).

deference—but an appellate court must still say what the law is and ensure that the juvenile court appropriately applied the legal standard.

¶70   Here, the court of appeals did not contest nor consider any facts beyond what the juvenile court evaluated. Rather, the court of appeals looked at the same record facts as the juvenile court and concluded that terminating this father's parental rights was against the clear weight of that evidence. Where, as here, none of the underlying facts are contested, the court of appeals properly considered the legal import of the facts in reaching its conclusion.

¶71   The court of appeals characterized the juvenile court's determination as resting on two conclusions. First, "that the Children needed stability, which the court believed could be better provided through adoption than through a permanent guardianship arrangement."[14] And second, that "the Children needed to be protected against Father's commitment for increased and continued visitation, including protection against Father's residual rights, which protection the court believed could be better provided through adoption than through a permanent guardianship arrangement."[15] I agree with the court of appeals' resolution of these issues and would conclude—as did that court—that (1) stability alone should not be a predominating factor in the best interest analysis; and (2) reliance on a prediction that the father will abuse his residual rights in the future is speculative and insufficient to make termination of those rights strictly necessary at this juncture.

¶72   First, the juvenile court's position that adoption affords more stability than permanent guardianship is the type of "categorical concern" that is insufficient to warrant termination of parental rights.[16] As the court of appeals points out, "[c]ategorical concerns about the lack of permanence of an option other than adoption are not enough [to justify termination of parental rights], otherwise termination and adoption would be strictly necessary across the board."[17] "[A] 'permanent guardianship by definition

---

[14] *In re D.S.*, 2023 UT App 98, ¶ 20, 535 P.3d 843.

[15] *Id.* (cleaned up).

[16] *See In re J.A.L.*, 2022 UT 12, ¶ 25, 506 P.3d 606.

[17] *In re L.L.B*, 2023 UT App 66, ¶ 23, 532 P.3d 592 (cleaned up), *quoted in In re D.S.*, 2023 UT App 98, ¶ 21.

does not offer the same degree of permanency as an adoption and there is always some risk that the permanent guardianship could come to an end, or be affected by visitation by the parent.'"[18] While the desire for permanency is relevant, applying such general considerations as a basis for every termination decision would significantly undermine the "strictly necessary" standard.

¶73 In reaching its conclusion, the court of appeals did not inappropriately reweigh the evidence. It did not look at the juvenile court's factual findings or the record to reach new factual conclusions about whether the children's grandmother would offer less permanency, or the father more permanency, than the juvenile court had forecasted. It instead answered a different question: whether, as a matter of law, permanency alone is an inappropriate categorical consideration. I agree that it is.

¶74 Second, the juvenile court failed to adequately support its finding that because of this father's residual rights, the best interests of the children favored adoption over permanent guardianship. The majority highlights the juvenile court's findings that the children no longer benefit from visits with their father, that they become avoidant and anxious after visits, and that the father appears to be oblivious to the impact the visits have on the children. It states that the children's negative responses to visits with their father "went beyond mere boredom or discomfort with the prison setting," and that the children "did not want to participate in and avoided visits."[19]

¶75 There is no question that the visits were difficult and uncomfortable. But the relevant inquiry is not whether the children want visits with their father, or even if those visits improve the relationships the children have with their father. It is whether an arrangement other than adoption can protect the interests of the children as well as adoption can. Under either a permanent guardianship or adoption, the grandmother indicated her response to the father's visits would be the same: she would follow the therapist's guidance as to what is best for the children. The father represented to the court that he would abide by the therapist's recommendations. Because the result for the children is identical

---

[18] *In re D.S.*, 2023 UT App 98, ¶ 21 (quoting *In re J.A.L.*, 2022 UT 12, ¶ 24).

[19] *Supra* ¶ 56.

under either a permanent guardianship or adoption, termination is not strictly necessary here.

¶76 The father expressed to the juvenile court his "commitment for increased and continued visitation," and that once released, he hoped to have "some involvement" in his children's lives. The juvenile court cited concerns that allowing the father to maintain residual rights would mean that the children's contact with him would not be based solely on the children's needs, desires, and best interests. But this conclusion assumes facts not in the record—that the father will, in the future, seek visitation above what would be best for his children. The children's best interest will always override the father's, but only when they come into conflict. Here, we do not yet know what the father will do. There is no evidence in the record that the father's interests and the best interests of his children are yet in conflict, or that they ever will be. Absent such evidence, adoption and permanent guardianship are equally beneficial to the interests of the children, and termination is not strictly necessary.

¶77 And importantly, if the father ever abuses his residual rights in the way the juvenile court foretells, the children's grandmother will not be left without recourse. As a permanent guardian, she may seek court intervention to further limit the father's parent-time.[20] The court of appeals noted that "[a] guardian who does not think that a parent's parent-time request is 'reasonable' may resist that request, and any disputes between the guardian and the parent about the scope of 'reasonable' visitation will be resolved 'by the court,' with the best interest of the child in mind."[21] Seeking court intervention at an unknown future date may be inconvenient; it is an additional procedural burden. But the law protects the father's parental rights unless termination is "strictly necessary."[22] We should wait for the circumstance to

---

[20] *See* Utah Code § 80-1-102(70)(a)(iv) (residual right to parent-time limited only to *reasonable* requests); *see also id.* § 78A-6-357(3)(d) (parent may not seek restoration of custody from permanent guardian).

[21] *In re D.S.*, 2023 UT App 98, ¶ 22 (quoting Utah Code § 80-1-102(70)(a)(iv)).

[22] Utah Code § 80-4-104(12)(b).

materialize that would warrant stripping those rights away, if it ever does.

¶78 Last, the majority states the court of appeals erred in reaching the issue of whether the juvenile court could consider the children's preference for adoption without first deciding that the children were "of sufficient capacity to express [their] desires."[23] The majority correctly notes the father did not challenge this finding in the juvenile court and thus it was waived on appeal. But the majority adds that "even if we were to completely discount the juvenile court's finding that the children desired adoption, it would not change our resolution of this case because the juvenile court's best interest determination was supported by other evidence."[24]

¶79 I agree with the majority that the issue was unpreserved and with the juvenile court's finding that the children preferred adoption is a fact that must be weighed in the best interest analysis. In contrast to the majority, I would conclude that the other evidence the juvenile court relied on to support its best interest determination was legally inadequate. Thus, the children's preference for adoption would be all that remains, and that expressed preference alone is insufficient to show that adoption is strictly necessary.

¶80 We are obligated to "start the best interest analysis from the legislatively mandated position that wherever possible, family life should be strengthened and preserved."[25] And "[i]f the child can be equally protected and benefited by an option other than termination, termination is not strictly necessary."[26] If a juvenile court is able to design a remedy that protects the children just as well as adoption but without the harm of severing a parent's rights, then it must. Here, the juvenile court's factual findings do not demonstrate that adoption would be any better for the children than permanent guardianship. Termination is therefore not strictly necessary.

––––––––––––

[23] *Supra* ¶¶ 63–64 (quoting *In re D.S.*, 2023 UT App 98, ¶ 29 (cleaned up)).

[24] *Supra* ¶ 64.

[25] *In re B.T.B.*, 2020 UT 60, ¶ 66 (cleaned up).

[26] *Id.*